Moshe **SHABAT** and Agnes Shabat, Individually and on Behalf of Her Minor Children, Talia Shabat and Jonathan Shabat, Plaintiffs,

v.

**BLUE CROSS BLUE SHIELD OF the ROCHESTER AREA, et al., Defendants.**

No. 93–CV–6199L.

United States District Court, W.D. New York.

May 15, 1996.

Nira T. Kermisch, Rochester, NY, Emmelyn Logan–Baldwin, Rochester, NY, for Moshe Shabat, plaintiff, Agnes Shabat, Individually and on behalf of her minor children, Talia Shabat and Jonathan Shabat, plaintiff.

Paul J. Yesawich, III, Harris, Beach & Wilcox, Rochester, NY, for Blue Cross Blue Shield of the Rochester Area, defendant, Douglas Heywood, Individually and as Blue Choice Supervisor, defendant, Michael Cardillo, Individually and as ISD Manager, defendant, Pat Morrison, Individually and as Human Resources Manager, Blue Cross Blue Shield of the Rochester Area, defendant, Emily Neece, Individually and as Vice President of Human Resources Blue Cross Blue Shield of the Rochester Area, defendant, Frank Billotti, Individually and as Blue Choice System Coordinator, defendant, Tom Napier, Individually and as Senior Programmer Analyst, defendant, Greg Storm, Individually and as Programmer Specialist, defendant, Jerry Toscano, Individually and as Operation Manager, defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Moshe Shabat, an employee of defendant Blue Cross/Blue Shield of the Rochester Area ("Blue Cross"), brings this action against Blue Cross and several employees of Blue Cross. Plaintiff, an Israeli-born Jew who maintains dual American and Israeli citizenship, alleges that he has been discriminated against on account of his national origin, religion, and hearing impairment. Plaintiff also alleges that defendants

have retaliated against him because of his complaints of discrimination. Defendants have moved for summary judgment.

## PROCEDURAL BACKGROUND

The original complaint asserted causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York State Human Rights Law ("HRL"), N.Y.Exec.L. § 296. The complaint also contained claims by plaintiff's wife and children for loss of consortium and loss of parental services.

On April 10, 1995, I granted in part and denied in part defendants' motion to dismiss the complaint or in the alternative for partial summary judgment. I dismissed plaintiff's Title VII claim against the individual defendants and the claims by plaintiff's wife and children. I also dismissed plaintiff's ADA claim, but granted plaintiff leave to amend his complaint to assert a claim against Blue Cross only under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796. I denied defendants' motion to dismiss plaintiff's HRL claim without prejudice.

Plaintiff then filed an amended complaint.[1] The complaint[2] asserts three causes of action. The first is under Title VII, and alleges that plaintiff has been discriminated against on account of his national origin and religion. Plaintiff alleges that he has been subjected to a hostile work environment and that he has been denied equal employment opportunities. Plaintiff also alleges that he has been retaliated against for complaining about these acts of discrimination.[3] The facts underlying these claims were set out at some length in my prior decision, familiarity with which is assumed.

The second cause of action is brought against Blue Cross under the Rehabilitation Act. Plaintiff alleges that he has been ha-

rassed and denied equal employment opportunities because of his hearing disability.

The third cause of action is brought against Blue Cross and the five individual defendants under the HRL. Plaintiff alleges that he has been discriminated against because of his national origin, religion, and disability, and that he has been retaliated against because of his complaints of discrimination, all in violation of the HRL.

## DISCUSSION

### I. Hostile Work Environment

As stated, plaintiff's claims of discrimination (as opposed to retaliation) fall into two factual categories: claims that he was subjected to a hostile work environment, and claims that he was denied equal employment opportunities.

▪ Liability based on a hostile work environment exists when "the [plaintiff's] workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' ..." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). To establish this claim, however, the plaintiff "must prove more than a few isolated incidents of [discriminatory] enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986) (citations omitted).

▪ In the case at bar, plaintiff bases his hostile-work-environment claim on an a series of alleged incidents occurring between the Spring of 1988 and early 1992. In general these events fall into three categories: incidents involving either explicit or implicit ref-

---

1. Three of the defendants named in the original complaint have been dropped from the amended complaint: Frank Billotti, Tom Napier, and Greg Storm.

2. All further references to "the complaint" are to the amended complaint, unless otherwise noted.

3. Although on its face this cause of action appears to be brought against all defendants, in accordance with my prior decision as well as the Second Circuit's recent decision in *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir.1995), I construe this claim to be against Blue Cross only.

erences to plaintiff's religion or national origin; incidents that plaintiff believes were implicitly related to his hearing impairment, none of which involved direct references to his impairment; and incidents in which plaintiff alleges he was harassed or treated unfairly, but which do not involve any even veiled references to his national origin, religion, or hearing impairment.

The first category generally involves comments from coworkers that plaintiff alleges were derogatory and based on his religion and national origin. For example, the first incident alleged, in the Spring of 1988, was a comment by a coworker, Tom Napier, asking Shabat whether "people from the Mideast beat their wives." In August 1989, defendant Douglas Heywood, who was then Shabat's supervisor, allegedly asked Shabat, "How come you cannot accept Jesus Christ as the messiah, the son of God? After all, he was a Jew." In October 1989, Heywood granted Shabat's request for a personal holiday on Yom Kippur, but allegedly told Shabat that he "approved the day even though there is no such holiday."

In February or March 1991, plaintiff and Heywood met with defendant Pat Morrison, the Human Resources Manager at Blue Cross, to discuss Shabat's continuing problems with Heywood. Morrison allegedly stated at the meeting that "Israelis are blunt, direct, candid and honest people," and that Americans "cannot handle Moshe's brand of honesty."

Another incident occurred in April 1991, during Passover. Shabat brought some "matzah cake" to share with his coworkers. Another employee, Frank Billotti, allegedly asked Shabat, "Who did you have to kill to make it?" Plaintiff claims that this was an allusion to a once-common myth spread by anti-Semites that Jews killed children and used their blood when baking matzah for Passover. Plaintiff alleges that Heywood was present when Billotti made this remark and did nothing. When plaintiff complained to Heywood, Heywood told him that Billotti was only joking.

The incidents relating to plaintiff's hearing involve a few occasions when Heywood allegedly criticized Shabat for speaking too loudly.

Plaintiff states that he tends to speak loudly at times because of his hearing impairment. Plaintiff also alleges that at one point he was assigned to work in an office where there was a lot of background noise, which made it more difficult for him to hear, which in turn made him speak loudly.

The third category of incidents are those in which plaintiff claims that he was harassed or unfairly treated, but which on their face do not relate even implicitly to plaintiff's national origin, religion, or disability. For example, plaintiff alleges that in April 1991, Heywood unjustifiably criticized plaintiff for "going too fast" on a project. Plaintiff also alleges that at a meeting in June 1990 Heywood "verbally abused" Shabat and "at one point even raised his hand as if to strike" Shabat, but plaintiff does not allege that Heywood made any comments about Shabat's religion, national origin, or hearing impairment on that occasion.

Even construing the record in the light most favorable to plaintiff, I find that these alleged incidents do not give rise to a triable issue of fact concerning the existence of a hostile work environment. Most of these incidents involved nothing more than occasional, brief comments, some of which reflect a clash of personalities more than discriminatory animus. Taken as a whole, they simply did not create the kind of abusive work environment, permeated with discrimination, that is necessary to support liability for creating or tolerating a hostile work environment. *See Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1402–03 (8th Cir.1992) (although there clearly were personality conflicts between Mexican–American plaintiff and other staff members, including his supervisor, "these conflicts, even taken with [the supervisor's] ethnic humor, did not rise to the level of severity or pervasiveness necessary to demonstrate a discriminatorily hostile work environment actionable under Title VII").

■ Plaintiff may have *believed* that he was being subjected to abuse because of his national origin, religion, or disability. His subjective reaction to his coworkers' actions has allegedly been so severe that he has been on disability leave since 1992. Plaintiff's own

perception that his work environment was hostile is not enough, however; to prevail on this claim, it is also necessary that plaintiff's work environment be *objectively* hostile. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 301 (1993).

■ Factors to be considered when determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. *See also Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184 (2d Cir.1987) ("to demonstrate a hostile work environment more than an episodic pattern of [discriminatory] antipathy must be proven ...")[4]; *Bennett v. New York City Dep't of Corrections,* 705 F.Supp. 979 (S.D.N.Y.1989) (plaintiff "must prove more than a few isolated instances of [discriminatory] friction.... [T]he incidents of harassment [must] occur either in concert or with a regularity that can reasonably be termed pervasive") (citations omitted).

Neither the frequency nor the severity of the allegedly discriminatory conduct supports plaintiff's claim in this case. Even assuming that every incident alleged by plaintiff did occur, it is clear that these were far from regular occurrences; most of them were separated by a month or more. Thus, it could hardly be said that they "permeated" plaintiff's workplace.

Furthermore, some of the alleged comments by plaintiff's coworkers did not make any reference whatsoever to plaintiff's religion, national origin, or disability. In any workplace, friction will sometimes occur, and people may lose their tempers or display some hostility toward their coworkers. Not every such occurrence can be attributed to unlawful discrimination.

In addition, I do not believe that the incidents that allegedly related to plaintiff's hearing impairment (*i.e.* being criticized for talking too loudly) can be considered as contributing to the same hostile work environment as the comments relating to his religion or national origin. Plaintiff's counsel conceded at oral argument that the disability claim is separate from the religion and national-origin claims, and that at trial a jury would have to make separate findings on them. In considering whether plaintiff has shown a triable issue on these claims, then, they cannot simply be lumped together. The alleged discriminatory conduct based on plaintiff's disability is simply not related to the conduct based on his national origin and religion.

Even if all the acts complained of are considered together, though, they still do not give rise to a genuine issue of material fact. Many of the incidents were relatively minor, and they often involved what at most could be considered oblique references to plaintiff's membership in any protected category. For example, plaintiff alleges that in February 1991, he brought some baklava, a type of Middle Eastern pastry, to work to share with his coworkers, and that "Heywood refused to share with [Shabat] without an explanation." Besides the fact that Heywood's conduct on that occasion could not reasonably be deemed hostile, to infer discriminatory intent simply because a coworker declines to eat something offered to him simply has no basis in logic or fact.

Another example occurred in January 1991, during the Persian Gulf war. Plaintiff claims that he was reading a newspaper article that day about some of the weapons being used by the United States and its allies, and that a coworker, Greg Storm, commented that "Now Moshe knows all our secrets." It is not clear what inference plaintiff draws from that statement, but assuming that this was a veiled reference to Shabat's Israeli citizenship, it was nothing more than a stray

---

**4.** *Lopez* involved claims brought pursuant to 42 U.S.C. § 1981, the use of which has since been limited. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The analysis under Title VII remains the same, however.

remark that could not objectively be considered abusive or humiliating.

Morrison's alleged statements in 1991 that "Israelis are blunt, direct, candid and honest people," and that Americans "cannot handle Moshe's brand of honesty," are still another example of an action that was neither severe nor reflective of discrimination. There is nothing insulting about being described as "direct, candid and honest," and even if "blunt" carries some negative connotations, it appears that Morrison was simply trying to help Shabat overcome what Morrison saw as cultural differences that were giving rise to a clash of personalities between Shabat and some of his coworkers. *Cf. de la Cruz v. NYC Human Resources Admin. Dep't of Social Serv.,* 82 F.3d 16, 22 (2d Cir.1996) (statement by plaintiff's supervisor that plaintiff's problem was "cultural" did not reflect discriminatory animus, but supported defendants' assertion that plaintiff's work problems were caused by language difficulties).

Some of the alleged incidents were more insulting, and more explicitly related to Shabat's religion or national origin. In the Summer of 1988, for example, when Shabat invited his coworkers to his son's circumcision, Napier allegedly rebuked Shabat for inviting people to such a "barbaric ceremony," and then said, "Since when do you Jews circumcise your kids?"

Assuming that plaintiff's interpretation of Billotti's question about whom Shabat had killed to make the matzah cake is correct, that statement too was clearly insulting and offensive. Nevertheless, these remarks were not typical of plaintiff's day-to-day working environment. They were isolated, sporadic remarks and did not "permeate" plaintiff's workplace with an atmosphere of discrimination. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370.

██ Furthermore, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is not, by itself, actionable under Title VII. *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. It is not enough that the conduct of some of Shabat's coworkers was "merely offensive." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370. "Title VII prohibits discrimination; it 'is not

a shield against harsh treatment at the work place.'" *McCollum v. Bolger,* 794 F.2d 602, 610 (11th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987). To support this claim, the conduct of plaintiff's colleagues must have been such that it not only affected plaintiff's ability to work, but that from an objective standpoint it would also have adversely affected the work performance and the well-being of a reasonable person. *Brooms v. Regal Tube Co.,* 881 F.2d 412, 419 (7th Cir.1989). Given the infrequency of these remarks, and the fact that most of the incidents were relatively minor, I find as a matter of law that no factfinder could reasonably conclude that plaintiff was subjected to a hostile work environment for purposes of Title VII. *See Downes v. F.A.A.,* 775 F.2d 288, 293 (D.C.Cir.1985) (cause of action does not arise under Title VII "for each and every crude joke" made by fellow employees or supervisors); *Williams–Hill v. Donovan,* No. 82–185–Civ.–Orl.–19, 1987 WL 11274 * 6 (M.D.Fla. Feb. 3, 1987) (although "[p]laintiff was subjected to a reprehensible working environment ... in which racist, sexist and ethnic jokes were communicated throughout the office," nevertheless "the level of offensiveness d[id] not rise to the point of a violation of Title VII").

This is not a situation where the plaintiff has been subjected to vicious anti-Semitic comments, or a pattern of such behavior over an extended period of time. In that regard, an examination of cases that *have* found a hostile work environment based on comments relating to race, gender, etc. (or that have at least found issues of fact to exist) is instructive, for such cases generally involve far more serious and persistent conduct than that alleged in the case at bar.

In *Anthony v. County of Sacramento,* 898 F.Supp. 1435, 1447–48 (E.D.Cal.1995), for example, the court held that the plaintiff had established a triable issue of fact as to the existence of hostile work environment by presenting evidence of "a virtually unbroken stream of hostility during her five years" of employment with the defendant. Plaintiff, a black female sheriff's deputy who had been assigned to work at a jail, testified that "the use of racial slurs and sexual insults was

ubiquitous" at work, and introduced proof that "racist flyers were circulated at the jail and posted on bulletin boards, that calendars and newspapers were altered with racist comments and drawings, and that racist graffiti appeared in the workplace." *Id.* at 1447–48 (footnotes omitted). There was also evidence that "African–American inmates were regularly subject to physical abuse in her workplace," which "support[ed] her claim that she, as an African–American, felt not only unwelcome but endangered in the workplace." *Id.* at 1448–49.

In *Turner v. Barr*, 806 F.Supp. 1025 (D.D.C.1992), the court found a hostile work environment to exist where the plaintiff, a white Jewish Deputy United States Marshal, was subjected to repeated harassment by black coworkers, including: jokes about the Holocaust; comments implying that Jews were skillful in dealing with money; being referred to, along with other white employees, as "white asses" and "white boys"; being told to get his "white ass out of the office" because "this is a black office, for blacks, supervised by blacks"; being told to "get back to Georgetown," which was the black employees' nickname for the rear of the office, where the white deputies' desks were located; and other personal abuse. *See also Amirmokri v. Baltimore Gas & Elec. Co*, 60 F.3d 1126 (4th Cir.1995) (Title VII claim properly sustained where for six months plaintiff was subjected to daily "national origin" epithets and name-calling, and asked to perform objectively impossible tasks); *Gary v. Long*, 59 F.3d 1391 (D.C.Cir.) (repeated verbal and physical harassment of female plaintiff, culminating in rape, plainly sufficient to state a hostile-environment claim), *cert. denied*, ——— U.S. ———, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1273–75 (7th Cir.1991) (trial court did not err in finding that plaintiff's claim of hostile work environment was objectively reasonable, where evidence showed that: plaintiff was the only black working in his department; a black dummy had been hung in the doorway near his work station; graffiti reading "KKK" and "All niggers must die" appeared several times in the restroom; and plaintiff was subjected to racial taunts such as the nickname "Buck-

wheat" for the first ten years of his employment); *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir.1985) (plaintiff subjected to racial slurs for five years), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986); *Currie v. Kowalewski*, 842 F.Supp. 57 (N.D.N.Y.) (employer created hostile environment where he continually hugged plaintiff and otherwise touched her in an unwelcome manner, and made sexual innuendos, advances and remarks over an eleven-month period), *aff'd*, 40 F.3d 1236 (2d Cir.1994).

On the other hand, courts in a number of other cases have found that a hostile work environment did not exist in circumstances at least as severe as those alleged in the case at bar. For example, in *Kantar v. Baldwin Cooke Co.*, No. 93 C 6239, 1995 WL 692022 (N.D.Ill.1995), the court held that the plaintiff, a Jewish female, had not established her hostile-work-environment claim despite evidence that: her supervisor referred to plaintiff more than once as a "JAP" (Jewish American Princess); that he had inquired about the cost or price of her religious faith, and had a practice of needling or teasing the plaintiff about leaving early on Fridays for religious services; that a coworker had referred to someone as "Jewish speaking"; and that her supervisor occasionally asked about the plaintiff's sexual activities. 1995 WL 692022 * 3. In support of its conclusion that the plaintiff had not proved her claim, the court stated that the plaintiff had merely "complain[ed] of a handful of comments spread out over two years," and that she "simply had personality conflicts with [her supervisor] and her co-workers." *Id.* at * 4.

In *Kaplan v. Banque Nationale de Paris*, No. 94 CIV. 3965, 1995 WL 753900 (S.D.N.Y. Dec. 19, 1995), the court dismissed a hostile-work-environment claim by a Jewish male who alleged that over the course of a few months, his supervisor made several anti-Semitic remarks, including referring to Jews as "Hebes," telling the plaintiff not to "be so Jewish about it" when the plaintiff pointed out a miscalculation of certain profit and loss figures, and telling plaintiff that his employer was not a "Jewish bank." The court concluded that these were "isolated offensive utter-

ances that d[id] not rise to the level of a Title VII violation." 1995 WL 753900 * 6.

In *Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419 (E.D.Mich.1984), *aff'd,* 805 F.2d 611 (6th Cir.1985), the court found no Title VII violation even though the female plaintiff had to work with "an extremely vulgar and crude individual who customarily made obscene remarks about women generally, and, on occasion, directed such obscenities to plaintiff." *Id.* at 615. Additionally, the plaintiff was exposed to pictures of nude women which were displayed from time to time in the office by other male employees. In reaching its conclusion that plaintiff had not established her claim, the court stated that "Title VII was [not] designed to bring about a magical transformation in the social mores of American workers." *Id.* at 430.

As in these cases, the case at bar involves a plaintiff who plainly did not get along with some of his coworkers. In addition, some of his coworkers are alleged to have occasionally made comments that were offensive to plaintiff. These facts and allegations, however, do not amount to a Title VII violation.

Furthermore, a number of the incidents involved relatively low-level employees whose actions cannot be attributed to Blue Cross. There is no evidence here that Blue Cross "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir.1992). Although plaintiff occasionally complained about these events to Heywood or others, it appears that he frequently kept his feelings to himself; in fact, in connection with the time that Shabat was called in to work on a Jewish holiday, Cardillo criticized him for *not* raising the issue prior to the holiday so that the problem could have been avoided. The record also reflects that Shabat met on some occasions with different supervisors who attempted to work out Shabat's difficulties with his coworkers. Although their efforts ultimately proved unsuccessful, there is no showing that Blue Cross provided no reasonable avenue for plaintiff to air his complaints; they did not retaliate against him or refuse to discuss Shabat's concerns.

## II. Disparate Treatment

In addition to his hostile-work-environment claim, plaintiff also alleges that he was denied equal employment opportunities. Plaintiff bases this "disparate treatment" claim on his allegations that he was denied a promotion and that he was disciplined by being "written up" on some occasions under circumstances in which a non-Jewish employee would not have been disciplined.

■ In a Title VII action based on alleged disparate treatment, the plaintiff bears the burden of proving that defendants took some discriminatory action against him for an improper reason such as his national origin or religion. Absent direct evidence of discriminatory intent, the plaintiff may rely on the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824).

■ To establish a prima facie case of individualized disparate treatment under this analysis a plaintiff must show: (1) membership in a protected class; (2) that he satisfactorily performed the duties required by the position; (3) that defendant had a policy or practice of providing services, training or other benefits, which were denied to plaintiff; and (4) that he was not provided these bene-

fits under circumstances giving rise to an inference of discrimination. *See Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 161 (2d Cir.), *cert. denied*, 502 U.S. 880, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991).

▇ I find that plaintiff's claim in this case is flawed in several respects. One element of this claim is that defendants took some adverse action toward plaintiff. *de la Cruz*, 82 F.3d at 20; *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir.1991) (ADEA case). The actions that plaintiff alleges were taken against him in the case at bar, however, are so trivial that they cannot reasonably be considered "adverse," and the circumstances under which they occurred are not suggestive of discriminatory intent.

One of plaintiff's claims is that he was denied a promotion, but in fact he was promoted. In September 1990, at Heywood's recommendation, plaintiff was promoted to Senior Programmer Specialist. Heywood's memorandum recommending the promotion stated that "over the last 3 years [Shabat] has consistently demonstrated great technical skills" and that Shabat had "acquired quite a list of accomplishments ..." Defendants' Statement of Facts Not in Dispute Ex. 14. The memo contained many other complimentary statements about Shabat, stating that "[a]nytime an assignment needs to be done quickly or is complex, Moshe is one of the first people that comes to mind," and that Shabat "has gained the respect of his peers." *Id.*

Plaintiff does not deny that he received this promotion. His contention is simply that he should have gotten it sooner. Plaintiff states in his affidavit that he "forced [Heywood's] hand ... by approaching him and advising him that I had been told by a number of team members that he had already decided that I would never be promoted. Mr. Heywood was confronted with either substantiating my claims that I was being discriminated against, and admitting that he already decided that he would never promote me, or try to protect himself, and promote me." Plaintiff's Affidavit ¶ 46. Plaintiff then states that "[t]his promotion

did not come of [Heywood's] own free will. Had I not approached him with the consensus in the department that he would never promote me, I am positive that such promotion would not have been forthcoming." *Id.* ¶ 47.

It is difficult to see the logic of plaintiff's assertion. He claims that Heywood recommended his promotion (in a glowing performance appraisal) in order cover up his discriminatory intent. Plaintiff thus seeks to use an action taken in his favor in order to draw a negative inference against defendants: in effect, he asserts that Heywood promoted him so that no one would realize that Heywood did not want to promote him.

Plaintiff's assertion that he somehow "forced Heywood's hand" fails to raise an issue of material fact. Regardless of whether Shabat confronted Heywood, the fact remains that Heywood did recommend his promotion, and there is no support for plaintiff's assertion that the recommendation was not the product of Heywood's "own free will." There is no reason to believe, as plaintiff asserts, that a failure to recommend Shabat for promotion at that time would have constituted an implicit admission that he was prejudiced against Shabat.

▇ Plaintiff may believe that he should have been promoted sooner, but he has not presented evidence that an employee in his position and with his record would have been promoted sooner in the ordinary course of events. He has therefore not shown evidence that Blue Cross had a policy or practice of awarding promotions that was not followed in Shabat's case. An employee's mere dissatisfaction with the pace of his career progress, based on his subjective assessment of his own performance, is not enough to make out a prima facie case under Title VII. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir.1994) (submission of materials from coworker or supervisor indicating that employee's performance was satisfactory does not create issue of fact where employer was dissatisfied with employee's performance); *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1039 (10th Cir.1993) (employee's own assessment of his

job performance is inadequate to raise issue of fact for trial); *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir.1991) ("The fact that an employee disagrees with an employer's evaluation of him does not prove pretext"); *Jimoh v. Ernst & Young*, 908 F.Supp. 220, 226 (S.D.N.Y.1995) (to prove discrimination claim, "plaintiff must do more than simply disagree with his employer's business decisions").

▮▮▮ Furthermore, the issue before the court is not whether the decision not to promote Shabat sooner was wise or unwise. The laws prohibiting discrimination in employment were "not intended to transform the courts into personnel managers." *Thornbrough v. Columbus and Greenville R.R. Co.*, 760 F.2d 633, 647 (5th Cir.1985). Federal courts do not have a "roving commission to review business judgments," *Montana v. First Fed. Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir.1987)), and they "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process." *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

▮▮▮ In addition, there is no evidence to support plaintiff's assertion that Heywood's alleged delay in promoting Shabat was due to discrimination. "It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate non-discriminatory reason." *Douglass v. United Services Automobile Ass'n*, 65 F.3d 452, 459 (5th Cir.1995). Heywood states in an affidavit that he did not recommend Shabat for promotion in 1989 because Shabat's performance had been unsatisfactory in several respects, an assessment that is reflected in several memoranda that Heywood prepared that year. *See* Defendants' Statement of Facts not in Dispute Exs. 8, 10, 11. Although plaintiff disagrees with these evaluations, again that is not the issue. Plaintiff must proffer some evidence that these nega-

tive evaluations, and the ensuing failure to recommend him for promotion, were the result of discrimination. He has not done so.

Notably, plaintiff does not allege that he told Heywood that the consensus in the office was that Heywood would never promote Shabat because of Shabat's religion or national origin. At most, the only implication of Shabat's statement was that Heywood did not like Shabat, for whatever reason.

Moreover, some of the evidence submitted by plaintiff tends to show that Heywood did *not* have a discriminatory attitude toward Shabat. As noted, the memorandum recommending Shabat's promotion praised his performance in a number of areas. On another occasion, Heywood passed on a memorandum that he had received from someone in another department at Blue Cross expressing her appreciation for some work that Shabat and another employee had done regarding a certain computer project. On the memo, Heywood wrote: "Moshe, Frank: *excellent job.* It is really rewarding when we can develop something that pleases the users like this project did. Doug 1/19/90" Plaintiff's Aff. Ex. Q. Those words are hardly those of someone with discriminatory bias against plaintiff. Though I recognize that plaintiff and Heywood's relationship was not always so cordial, the point is that the evidence does not show any general animus against Shabat on Heywood's part.

▮▮▮ Plaintiff asserts that his evaluations had been better before he was assigned to work under Heywood. However, "prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality." *Billet*, 940 F.2d at 826; *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 343–44 (3d Cir.1990). Shabat received both positive and negative reviews from Heywood; there is no evidence of a dramatic change in the tenor of his evaluations that would tend to cast doubt on the sincerity of the negative reviews. *Cf. Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 32, 39 (2d Cir.1994) (where plaintiff's personnel file contained no document indicating any

prior criticism of his performance, fact that one week before plaintiff was discharged, supervisor gave him negative review threatening discharge unless there was "significant improvement immediately," together with employer's refusal to explain how plaintiff needed to improve, could lead factfinder to discredit employer's assertion that plaintiff was fired because of poor performance).

 Shabat's claims that he was disciplined for discriminatory reasons are similarly defective. For one thing, the alleged "discipline" apparently consisted only of being "written up," apparently meaning that a report was put in Shabat's personnel file. Plaintiff, however, does not deny defendants' assertion that he was never demoted or denied pay or other benefits as a result of these reports. Although it is not necessary that an employee suffer some pecuniary loss for an employment action to be considered "adverse," *see de la Cruz*, 82 F.3d at 20–21, these incidents are too inconsequential to support an action under Title VII. *See Harlston*, 37 F.3d at 382 (reassignment did not constitute adverse action where plaintiff suffered no diminution in title, salary, or benefits).

### III. Rehabilitation Act Claim

 The Rehabilitation Act ("the Act") makes it unlawful to exclude a disabled person from participation in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. To establish a claim under the Act, a plaintiff must show that: "1) he or she is a '[disabled] person' as defined in the Rehabilitation Act; 2) he or she is 'otherwise qualified' to participate in the offered activity or to enjoy its benefits; 3) he or she is being excluded from such participation or enjoyment solely by reason of his or her handicap; and 4) the program denying the plaintiff participation receives federal financial assistance." *Rothschild v. Grottenthaler*, 907 F.2d 286, 289–90 (2d Cir. 1990).

 Defendants contend that this claim fails because Blue Cross's receipt from the Federal Government of insurance premiums on behalf of Medicare recipients does not constitute "federal financial assistance," and in the alternative, on the ground that even if those premiums do constitute such assistance, plaintiff is not involved in the program or activity receiving federal assistance, *i.e.* the Medicare program.

I find it unnecessary to reach this issue, however, because I find that plaintiff has not demonstrated the existence of any issue of material fact concerning whether he has been excluded from participation in a program or activity solely by reason of his handicap. For the reasons already stated in connection with plaintiff's Title VII claims, the evidence does not support an inference that plaintiff has been discriminated against on account of his hearing disability. The record shows only that he was criticized on a handful of occasions for talking too loudly, which plaintiff alleges was due in part to the fact that the office he was working in was noisy. Plaintiff has not demonstrated how those actions could support a claim under the Act.

In particular, plaintiff has not shown how he has been excluded from participating in a program solely by reason of his handicap. Assuming *arguendo* that plaintiff's employment constitutes a "program" for purposes of the Act, there is no evidence that defendants did not allow Shabat to "participate" in that program. Plaintiff was not fired, and there is no evidence that he was denied any benefit on account of his hearing impairment.

 Under the Act, employers have an obligation to provide an otherwise qualified handicapped employee with "reasonable accommodations" to permit the employee to perform the essential functions of his job. *Lyons v. Legal Aid Society*, 68 F.3d 1512, 1515 (2d Cir.1995); 45 C.F.R. § 84.12(a). There is no evidence in the case at bar, however, that Blue Cross failed to fulfill this obligation. The only allegations concerning plaintiff's disability are that Heywood occasionally criticized him for talking loudly, which plaintiff claims results from a combination of his hearing loss and the noisiness of his work area. However, there is no evidence that this circumstance prevented him from performing the essential function of his job, or that it was related to a loss of pay or denial of any benefits. Although Shabat's

performance reviews were sometimes critical of his interpersonal skills—which may have played a part in his being passed over for promotion in 1989—the reviews did not criticize him for speaking loudly. It was *what* he said to his coworkers, not how loudly he said it, for which he was criticized.

There is likewise no evidence that Shabat's current disability leave was precipitated by problems stemming from his hearing impairment; Shabat's disability leave was preceded by clashes with various coworkers, but there is no indication that his hearing loss had anything to do with those incidents, or that those incidents would not have occurred if Shabat had been assigned to work in a quieter area.

It should also be noted that my dismissal of plaintiff's Rehabilitation Act claim is not inconsistent with my decision on defendants' previous motion for partial summary judgment. Plaintiff's original complaint asserted a cause of action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* I found that the ADA did not apply to this case, but granted plaintiff leave to replead to allege a claim under the Rehabilitation Act, stating that "it does not appear beyond doubt that the plaintiff could not allege and prove facts necessary to state a claim under the Rehabilitation Act." Decision and Order, Apr. 10, 1995, at 14. Plaintiff now having proffered his evidence in opposition to defendants' current motion, however, I find that he has failed to show the existence of a triable issue of fact on this claim.

### IV. Retaliation Claims

■ Plaintiff also contends that defendants retaliated against him because he complained about perceived discrimination. In order to establish this claim, plaintiff must show: that he engaged in protected activity; that the alleged retaliator knew of the activity; that he was subjected to an employment action that disadvantaged him; and that a causal connection exists between the protected activity and the disadvantageous employment action. *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.)

(citations omitted), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987).

■ For the reasons already stated with respect to his substantive discrimination claims, however, Shabat has not presented evidence that he was subjected to a disadvantageous employment action. The evidence shows that Shabat complained on one occasion to the Director of Human Resources that his civil rights had been violated because he was required to work on a weekend during a Jewish holiday. Plaintiff also alleges that he complained to his supervisors about coworkers making anti-Semitic remarks, and for purposes of this motion I will assume that that allegation is true.

What is lacking in the record, however, is any evidence that any actions were taken against plaintiff as a result of those complaints. Although Shabat continued to have sporadic run-ins with various coworkers, there is no indication that these incidents increased in frequency or intensity after he complained. As to the complaint concerning being required to work on a religious holiday, Michael Cardillo, one of Shabat's supervisors, at plaintiff's request, sent Shabat a memo concerning a number of problems that Shabat had had recently with his coworkers. Among other things, he told Shabat that Shabat should have known that he would be expected to work on the weekend in question, and that he should have raised his concerns ahead of time so that the conflict could have been avoided, rather than going to work and then complaining afterwards. *See* Defendants' Statement of Facts not in Dispute Ex. 13.

Plaintiff contends that this shows that he was "written up" for complaining about a civil rights violation. As noted, however, the memo from Cardillo states that it was prepared because Shabat had "asked [Cardillo] to provide additional information" regarding several recent incidents involving plaintiff. *Id.* In addition, Cardillo told Shabat in the memo that the memo "was prepared only for you. It is *not* for your file and it is not intended to be used against you." *Id.* Thus, there is no evidence that any action was taken against plaintiff because of his complaint. Furthermore, Cardillo's criticism of

Shabat was directed not at the fact of Shabat's complaint *per se*, but at his failure to raise the issue prior to the weekend in question.

### V. Human Rights Law Claim

Having dismissed plaintiff's federal claims, I decline to exercise jurisdiction over his claim under the New York Human Rights Law. "It is well settled that 'if the federal claims are dismissed before trial ... the state claims should be dismissed as well.'" *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)); *see also* 28 U.S.C. § 1367. Plaintiff's Human Rights Law claim is therefore dismissed.

### CONCLUSION

Defendants' motion for summary judgment (Item 50) is granted, and the complaint is dismissed.

IT IS SO ORDERED.