Jerry HINES, Jr., Plaintiff,

v.

HILLSIDE CHILDREN'S CENTER, Defendant.

Melanie E. Burton, Plaintiff,

v.

Hillside Children's Center, Defendant.

Ellis Leach, Plaintiff,

v.

Hillside Children's Center, Inc., Defendant.

Nos. 96–CV–6203L, 97–CV–6326L, 98–CV–6038L.

United States District Court, W.D. New York.

Sept. 28, 1999.

Rachna Vaid, Fulreader, Rosenthal, Sullivan, Clifford, Santoro & Kaul, Rochester, NY, for Jerry Jr. Hines, plaintiff.

Todd R. Shinaman, Nixon, Peabody LLP, Rochester, NY, for Hillside Children's Center, defendant.

*DECISION AND ORDER*

LARIMER, Chief Judge.

Plaintiffs in these three actions have all filed complaints against defendant Hillside Children's Center, Inc. ("Hillside"), alleging that Hillside has discriminated against them in their employment with Hillside on account of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The same lawyer represents all three of the plaintiffs. Hillside has moved in all three actions for summary judgment. Because these cases involve many of the same facts and legal issues, for purposes of these motions and this Decision and Order I am consolidating these cases pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, which permits consolidation "of any or all the matters in issue" in "actions involving a common question of law or fact...."

## FACTUAL BACKGROUND

### I. Jerry Hines, Jr.

Plaintiff Jerry Hines, Jr., a black male, began his employment with Hillside in December 1984 as a sociotherapist. He voluntarily resigned from Hillside in November 1986, but was rehired by Hillside in June 1987. Hines was fired four years later in May 1991, and it is that termination that is the subject of this lawsuit.

In October 1988, Hines had been promoted to supervisor of Hillside's Alexander Street Group Home ("Alexander"), which is a home for emotionally disturbed youths. At some point in 1990, Patti Bullen, a white female, was hired by Hillside as a part-time social worker at Alexander. It is clear that Hines and Bullen did not get along very well together, and they had a number of disagreements over various matters. Bullen was eventually transferred to a different facility in April 1991.

At the same time, Hines's supervisor, Curt Diesenberg, told plaintiff that he was being given forty-five days in which to improve his performance in certain areas. Diesenberg gave plaintiff a document outlining his areas of concern, which included plaintiff's understanding of Hillside's "philosophy of treatment," his supervisory duties, communications skills, etc. Diesenberg also set forth his expectations concerning Hines's improvement in those areas, as well as his methods of evaluating Hines's achievements. At the end of the forty-five days, Hines's performance was to be reevaluated, and a decision would be made whether to have him remain as a supervisor, to demote him, or to terminate him. Affidavit of Curt Diesenberg (Docket Item 18) ("Diesenberg Aff. 18")[1], Ex. A. Plaintiff denies that his work performance was deficient in any way, but he admits that Diesenberg told him that he needed to improve.

In early May 1991, Diesenberg instructed Hines to prepare a letter placing a staff member, Chris Schunk, on probation because of a prior incident involving Schunk. On May 10, Hines and Diesenberg met and discussed the letter that Hines had drawn up. Diesenberg was dissatisfied with the letter, and the two of them disagreed about what the contents of the letter should include. Hines refused to sign a letter containing the changes that Diesenberg wanted made.[2] Diesenberg then asked Hines to put down in writing his reasons for refusing to sign, and Hines wrote, "I feel that the probation letter that I written [sic] clearly states the infractions and the procedures thereof." Diesenberg Aff. 18 Ex. C. Diesenberg then signed his own version of the letter.

On May 16, 1991, Diesenberg signed a letter terminating Hines's employment.

---

1. Docket Item numbers refer to the docket sheet for the relevant plaintiff's action.

2. Plaintiff alleges that he told Diesenberg that although he disagreed with Diesenberg's version, he would sign it if he had to, and that

Diesenberg told Hines that he should not sign the letter if he did not agree with it. In any event, it is undisputed that Hines did not sign Diesenberg's version of the letter.

The letter stated that "Jerry Hines has shown insufficient progress in attaining the goals set to improve his job performance," and that Hines "has shown himself to be uncooperative and resistant to the directions outlined in the letter." Diesenberg also stated that "[o]n 5/10/91 Jerry was insubordinate by his failure to comply with a direct request of his supervisor," referring to the matter concerning Schunk's probation letter. Diesenberg Aff. 18 Ex. D.

On May 20, 1991, Hines filed a grievance with Hillside's Grievance Committee. His grievance letter made no mention of race or discrimination, but simply disputed some of the contents of Hines's termination letter, and alleged certain procedural defects relating to Hillside's personnel policies. The Grievance Committee held a hearing on July 16, 1991, with plaintiff present, and on July 21, the Committee issued a decision upholding plaintiff's termination. The Committee informed plaintiff by letter that "in choosing not to comply with Curt's directive to change the probationary statement you clearly put your employment status in jeopardy." Affidavit of Todd R. Shinaman (Docket Item 15) ("Shinaman Aff. 15") Ex. D.

On November 4, 1991, plaintiff filed a charge with the New York State Division of Human Rights ("DHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been discriminated against on account of his race. Several years later, at plaintiff's request, the DHR dismissed his complaint for administrative convenience on February 28, 1996, and the EEOC issued plaintiff a right-to-sue letter on January 29, 1996.

Plaintiff commenced this action on April 26, 1996. The complaint contains two causes of action for race discrimination under Title VII, and two claims for race and color discrimination under the New York Human Rights Law, N.Y.Exec.L. § 296.[3] Plaintiff seeks, *inter alia,* front and back pay, compensatory damages, and punitive damages.

## II. Ellis Leach

Plaintiff Ellis Leach, a black male, was hired by Hillside in 1986 as a sociotherapist. In September 1990, Diesenberg promoted Leach to assistant supervisor at Alexander.[4] Leach alleges that after Hines was terminated, Leach told Diesenberg and others at Hillside that he thought Hines had been treated unfairly.

Hines's termination created a vacancy for the position of supervisor at Alexander. Leach expressed interest in the position, and Diesenberg interviewed him for it.[5] Diesenberg also interviewed Karen Dell, who at the time was employed as a supervisor at another group home. Diesenberg chose Dell for the position.

Dell resigned from Hillside in August 1991, again creating a vacancy in the supervisor position. Diesenberg asked Leach if he was still interested, but did not

---

**3.** Counts I and II, both asserting Title VII claims, are identical, and allege discrimination on account of plaintiff's race. Counts III and IV, the HRL claims, are also identical except that Count III alleges that Hillside discriminated against plaintiff on account of his race, and Count IV alleges that Hillside discriminated against plaintiff on account of his color. Presumably, then, either Count I or Count II was intended to allege discrimination on account of plaintiff's color, and the reference in both counts only to race was an oversight.

**4.** Leach contends that Hines, not Diesenberg, actually promoted him, but he concedes that Hines only recommended him for the posi-

tion, and that Diesenberg had the ultimate authority to decide whether to promote Leach. Despite Leach's allegation that Diesenberg "was not comfortable" with Hines's recommendation, then, it is clear that in fact Diesenberg was the person ultimately responsible for the decision. Affidavit of Ellis Leach (Docket Item 20) ¶ 3.

**5.** Defendant's Statement of Material Facts not in Dispute states that Hines interviewed Leach for the position, but that appears to be a typographical error, as Diesenberg himself states that he interviewed Leach. Affidavit of Curt Diesenberg (Docket Item 13) ¶ 5.

interview him. Defendant states that Diesenberg saw no reason to re-interview Leach so soon after his May interview, but Leach contends that Diesenberg simply was not considering Leach at all for the position. Diesenberg also interviewed Sean Madden, who had been working in a similar position elsewhere within Hillside. Diesenberg chose Madden for the position.

On June 19, 1992, Leach filed a charge with the EEOC and DHR alleging that Hillside had discriminated against him on account of his race and color, and in retaliation for having opposed alleged discrimination against Hines and for testifying on Hines's behalf in his EEOC proceeding. Leach alleged that he had twice been denied promotion to supervisor, and that he had received an unfavorable evaluation on May 10, 1992, after he had testified for Hines.

In October 1992—while Leach's administrative proceedings were pending—the supervisor position again became available. This time, Diesenberg hired Leach for the position, where he remained for over four years, until May 1997, when he voluntarily resigned from Hillside.

The EEOC issued Leach a right-to-sue letter in November 1997 on the charge filed in 1992. Plaintiff filed the complaint in this action on January 30, 1998.

The complaint on its face sets forth seven causes of action, although as with Hines's complaint, the differences between some of them are not readily apparent. Counts I and II allege discrimination on the basis of Leach's race and color, respectively, in violation of Title VII. Count III sets forth a Title VII retaliation claim. Count IV (which is mislabeled Count VI) alleges race discrimination in violation of 42 U.S.C. § 1981. Counts V and VI assert race and color discrimination claims under the HRL, parallel to Counts I and II.

Count VII (which is also mislabeled Count VI) alleges race discrimination in violation of the HRL. The only difference between Count VII and Count V is that the latter states that Hillside is bound by the "provisions" of the HRL, whereas Count VII states that Hillside is bound by the "conditions" of the HRL. Complaint ¶¶ 41, 53. Plaintiff seeks essentially the same type of relief as that sought by Hines.

### III. Melanie E. Burton and Keith Webb

Plaintiffs Melanie E. Burton, a black female, and Keith Webb, a black male, are coplaintiffs in the third of these actions. Burton began working for Hillside in 1989 as a temporary recreation therapist. She became an assistant supervisor at the Arnett Group Home ("Arnett") in April 1994. Webb was hired as a sociotherapist in 1987, and held various positions before becoming an assistant supervisor at the Bausch Group Home in 1993.

In late 1994, the supervisor position at Arnett became vacant. Burton and Webb each applied for the position. It was Diesenberg's responsibility to select a candidate to fill the position. He used a "team" hiring process to assist him.[6] This involved using teams of Hillside employees to interview candidates, with each team member then scoring each candidate on each question. A panel of team members then voted on the candidates; any candidates deemed unacceptable based on the voting results were then dropped from consideration; the remaining candidates were ranked from best to worst; and those results were then compared to the team score results. Four minority and four nonminority candidates were interviewed for the position.

The top four candidates were the same in both the panel and team rankings, except that the persons in the third and

---

**6.** Although plaintiffs state in response to defendant's Statement of Undisputed Material Facts that "the team hiring process was not used to choose the best person to fill the position," Plaintiffs' Statement of Material Facts in Dispute ¶ 3, they do not dispute that this *process* was followed; it appears that they contend only that it was not used to select the *best* candidate.

fourth spots were switched. Wayne Wiggs, a white male who was then an assistant supervisor at the Finger Lakes Group Home, was ranked first by both interviewing panels; Burton was second, and Webb was fifth. Although he was not bound by these rankings, Diesenberg apparently agreed with them, because he chose Wiggs for the position. Because of his driving record, there was some question about whether Wiggs could obtain approval from Hillside's insurance company to drive vehicles on agency business, so Diesenberg made Wiggs's appointment contingent on his obtaining such approval. Wiggs did so in February 1995.

Burton and Webb both filed requests for administrative review of the decision to hire Wiggs. Hillside delayed Wiggs's appointment until such review was completed. The administrative review committee, which consisted of three African–American and two nonminority Hillside employees, issued a determination on March 28, 1995 that the process used to select a supervisor was fair, that the decision to hire Wiggs was appropriate, and that the "decision was not based on issues of race or gender and that there [wa]s no indication of discrimination." Affidavit of Curt Diesenberg (Docket Item 14) Ex. B.

Burton filed a charge with the DHR on February 15, 1995, alleging that she had been denied the promotion to supervisor at Arnett on account of her race, color and sex. On March 11, 1997, the DHR issued a finding of no probable cause, and dismissed the complaint.[7] The EEOC issued a right-to-sue letter on April 23, 1997.

Webb filed a charge with the DHR on April 17, 1995, alleging that he had been denied the promotion on account of his race and color. That charge was dismissed for lack of probable cause on

March 11, 1997, and Webb obtained his right-to-sue letter on April 23, 1997.

Plaintiffs filed the complaint in this action on July 18, 1997. Counts I and II allege that both plaintiffs have been discriminated against, on account of their race and color respectively, in violation of Title VII. Count III asserts a sex discrimination claim on behalf of Burton. Count IV sets forth a race discrimination claim by both plaintiffs under § 1981. Counts V, VI and VII assert HRL claims for race, color and sex discrimination, parallel to Counts I, II and III. Plaintiffs seek relief similar to that sought by Hines and Leach.

## DISCUSSION

### I. Legal Standards

The standard for deciding summary judgment motions is well established. Rule 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' "

7. Although plaintiffs state that the DHR initially found probable cause, but later reversed that finding "on narrow and erroneous grounds," Plaintiffs' Statement of Material Facts in Dispute ¶ 7, they have submitted no evidence of that other than Burton's statement to that effect. At any rate, regardless of

what the DHR may have found initially, the grounds upon which its ultimate decision was based were anything but "narrow." The DHR found that there was "no evidence" of discrimination. Affidavit of Todd R. Shinaman (Docket Item 12) Ex. D.

*Id.* at 587, 106 S.Ct. 1348 (quoting Fed. R.Civ.P. 56(e)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Id.* at 587, 106 S.Ct. 1348. When perusing the record to determine whether a rational fact-finder could find for the non-moving party, however, all reasonable inferences must be drawn in favor of the non-moving party. *See Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

The general principles underlying a motion for summary judgment fully apply to discrimination actions. Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Federal Savings and Loan Association of Rochester,* 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion). Consequently, once the moving party has met its burden, the non-moving party in a discrimination action must come forward with evidence upon which a rational fact-finder could return a verdict in her favor.

■ Discrimination claims brought under Title VII, 42 U.S.C. § 1981, and the HRL are governed by the three-part analytical framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Tomka*

*v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995). To the extent that a plaintiff's Title VII, § 1981, and HRL claims assert the same type of discrimination, they may therefore be analyzed in tandem. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998).

The *McDonnell Douglas/Burdine* framework is not intended to be "a rigid ritual, but simply an orderly way to evaluate proof when discrimination is claimed." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir.1988). Initially, the plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. To do so, the plaintiff must show four elements: (1) that he belonged to a protected class; (2) that he was qualified for his position; (3) that he was discharged; and (4) that the discharge occurred in circumstances giving rise to an inference of discrimination. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir.1989). This burden "is a 'modest one,' but it has substance nevertheless." *Viola v. Philips Med. Sys. of N.A.,* 42 F.3d 712, 716 (2d Cir.1994) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 109 (2d Cir. 1994)). "[T]he plaintiff cannot meet this burden through reliance on unsupported assertions," but "must come forward with evidence that would be sufficient to support a jury verdict in h[er] favor." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. Mar.24, 1995).

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. Should the defendant carry this burden, the presumption of discrimination created by the prima facie case "drops out of the picture," *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and the burden then remains with the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reason was actually a pretext for discrimination. *Bur-*

*dine,* 450 U.S. at 252–53, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. While it is true that " '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that their actions are motivated by factors expressly forbidden by law," *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (quoting *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989)), the plaintiff must still proffer evidence that puts the defendant's intent "genuinely in issue," and "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers,* 43 F.3d at 40.

## II. Individual Plaintiffs' Claims

In all three of these cases, defendant concedes, for purposes of its summary judgment motions only, that each plaintiff has made out a prima facie case. It is also apparent that defendant has also proffered a legitimate, nondiscriminatory reason for its actions in each case. I may therefore proceed directly to the ultimate issue: whether plaintiffs have presented sufficient evidence to give rise to a genuine issue of fact as to whether defendant's proffered reasons are a pretext for discrimination.

## A. Jerry Hines, Jr.

■ In Hines's case, Hillside contends that it terminated him for two reasons: his poor job performance and his failure to correct the problems identified by Diesenberg, as well as his refusal to sign the Schunk probation letter drawn up by Diesenberg. In opposition to defendant's motion, Hines to a great extent simply argues that his performance was not deficient. That is not enough, however, to defeat a well-founded motion for summary judgment. An employee's subjective opinion about his own qualifications is insufficient to give rise to a triable issue of fact concerning whether the employer's proffered reason for its actions is a pretext for dis-

crimination. *Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1039 (10th Cir. 1993) (employee's own assessment of his job performance is inadequate to raise issue of fact for trial); *Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir.1991) ("The fact that an employee disagrees with an employer's evaluation of him does not prove pretext"); *Layaou v. Xerox Corp.,* 999 F.Supp. 426, 432 (W.D.N.Y.1998).

Furthermore, even if plaintiff had offered evidence indicating that defendant's proffered reason for his termination is pretextual, "this is far from the end of the matter, for to survive summary judgment [plaintiff] ha[s] to show not only pretext, but also either use of a pretext that itself implies a discriminatory stereotype, or use of a pretext to hide ... discrimination." *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 200 (2d Cir.1999), *petition for cert. filed,* No. 99–339, 68 U.S.L.W. 3138 (Aug. 18, 1999). Plaintiff has not done so.

■ Hines notes that prior to 1991, his evaluations had generally been good. However, "prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality." *Shabat v. Blue Cross Blue Shield,* 925 F.Supp. 977, 988 (W.D.N.Y. 1996) (internal quotation marks and citation omitted), *aff'd,* 108 F.3d 1370 (table), 1997 WL 138836 (2d Cir.1997). *See also Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998) (citing *Shabat* with approval); *Billet v. CIGNA Corp.,* 940 F.2d at 826 ("prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual"); *Jensen v. Garlock, Inc.,* 4 F.Supp.2d 219, 223 (W.D.N.Y.1998) ("While a lengthy period of satisfactory performance may raise an inference of discrimination for purposes of establishing a prima facie case, by itself, such a factor is insufficient to suggest that an employer's amply supported reasons for terminating an employee are pretextual").

Moreover, it should be noted that it was Diesenberg who had prepared those prior, favorable evaluations. Plaintiff has presented no evidence to show why Diesenberg would have suddenly decided out of the blue to begin discriminating against Hines in 1991. Had he been so inclined, he could have given plaintiff poor reviews in prior years as well.

Much of plaintiff's other arguments consists of attempts to show contradictions in Diesenberg's deposition testimony. In general, though, these contradictions are either nonexistent or irrelevant to any material issue in this case. For example, plaintiff states in his brief that "Diesenberg also testified that Hines had had no problems whatsoever with the social workers prior to Bullen. This contradicted Diesenberg's testimony that part of the problem Hines had with Bullen arose from the overlap between the social work functions and the facility management functions." Plaintiffs' Memorandum of Law at 17 (citation omitted).

First, plaintiff's characterization of what Diesenberg actually said is not entirely accurate. Diesenberg did not state that "Hines had had no problems whatsoever with the social workers prior to Bullen." He stated that prior to Bullen's arrival, Hines's relationship with Bullen's predecessor, Dan Conheady, "was within reasonable range, so to speak." Diesenberg Depo. (Affidavit of Jerry Hines, Jr. (Docket Item 25)) Ex. A at 148. Plaintiff's other statement about the overlap between different functions is also an oversimplification of Diesenberg's testimony concerning the continual headbutting between Hines and Bullen.

Second, it is not apparent what the supposed contradiction even is here. I see no "inconsistency" between the statement that Hines had no problems with social workers prior to Bullen's arrival and the statement that his problem with Bullen stemmed from the overlap between their functions. Diesenberg testified that whenever Hines and Conheady had disagreed about things, they generally compromised, whereas with Bullen, Hines tended to be more stubborn, and when he had a disagreement with her, Hines "just dug in all the deeper...." Diesenberg Depo. at 148, 169.

Third, it is not at all apparent what these so-called inconsistencies have to do with plaintiff's claim of discrimination. Whatever minor contradictions or inconsistencies might be read into this testimony, it has no bearing on whether defendant's stated reason for terminating Hines is a pretext for race discrimination. It is undisputed that Hines and Bullen did not get along, and whether plaintiff got along or not with employees is irrelevant.

To analyze each of plaintiff's other contentions this fully would unduly lengthen this decision, but it is fair to say that most of them suffer from similar defects. For instance, plaintiff states that Diesenberg said that one of his previous supervisors did not get directly involved when he had had problems with one of his subordinates, and plaintiff asserts that this "was in direct contrast to Diesenberg's own hands-on intervention in the problems between Bullen and Hines." Plaintiff's Memorandum of Law at 18. Mere differences in management styles by two different people, however, does not show any disparate treatment of Hines, and it has nothing to do with any possible discrimination.

Likewise, plaintiff claims that Diesenberg contradicted himself when he stated that Hines was not treated differently from any other employee, although Hines was the only one given a forty-five-day improvement plan. The clear implication of Diesenberg's testimony was simply that any employee who had the performance problems that Diesenberg perceived with Hines would have been treated just as Hines was.

Plaintiff also makes a number of allegations about alleged racial animus on the part of Bullen. These allegations are of little relevance. Bullen was not involved

in the decision to terminate Hines (in fact, she was not even employed at Alexander by that point), so her comments are irrelevant on the issue of Hines's termination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (statements or actions by nondecisionmakers, or actions unrelated to decisionmaking process, cannot support allegation of pretext) (O'Connor, J., concurring); *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 97 (1st Cir.1996).

Second, no rational factfinder could reasonably conclude that Bullen's alleged statements had any racial overtones. Plaintiff alleges that Bullen once said to him, "Jerry, I come from Texas. I worked with rich people. I understand kids and I have more education than you." Bullen's alleged comments about working in Texas with "rich people" and having more education could not reasonably be interpreted as having a racial meaning. Similarly, Bullen's alleged statement to Hines that his wearing his hair in dreadlocks did not set a proper example for the children cannot reasonably be interpreted as evidence of racial animus. Various hairstyles worn by members of all races and ethnic groups have long been considered objectionable by some people, and there is no evidence that Bullen perceived Hines's dreadlocks as related to his race. *See EEOC v. United Virginia Bank/Seaboard Nat'l,* 615 F.2d 147, 155 (4th Cir.1980) ("In view of the fact that bank employees must deal with the public when on company assignment, we cannot see that comments concerning unusual hair styles indicate racial discrimination"); *Miller v. CCC Information Systems, Inc.,* No. 95 C 6612, 1996 WL 480370 *3 (N.D.Ill. Aug.22, 1996) (drawing an inference of racial harassment based on criticisms of plaintiff's hair "would require unwarranted and impermissible speculation"); *Bey v. Village of Arlington Heights,* No. 88 C 5479, 1991 WL 42165 *15 (N.D.Ill. Mar. 22, 1991) (observing with respect to testimony of plaintiff, a former police officer, that she wore her hair in dreadlocks and that a patrolman told her to "get a haircut," that "there was no evidence in the record that her hairstyle had a racial character to it so as to permit the officer's comment to be interpreted by the court as a racial slur"). Hines's subjective perception of Bullen's remarks as race-related, absent an objectively reasonable foundation for that perception, is not enough to give rise to an issue of fact.

Hines also testified at his deposition that he was treated differently from other group home supervisors because Bullen would implement changes at Alexander without consulting or informing him beforehand, but supervisors at other homes were always involved in such decisions. Hines also testified, however, that some of those other supervisors were black. Hines Depo. at 55. Furthermore, while Hines testified that one particular supervisor, Dave Grass (who is white), told him that before any decisions were made at his group home they were brought "to the team and to him" Hines Depo. at 60, that circumstance reflects no more than that Grass and his social worker had a better working relationship than did Hines and Bullen. Hines's belief that his race must have been the reason for this difference lacks objective factual support and amounts only to a purely subjective, speculative opinion that by itself carries no evidentiary weight. "It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate non-discriminatory reason." *Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1430 (5th Cir.1995) (en banc).

Like many of plaintiff's allegations of disparate treatment, plaintiff relies on little more than his "feelings." In the same vein, for instance, he testified that he "felt that as a black man," when he raised concerns about some matters or reported cer-

tain incidents, no one took him seriously. Hines Depo. at 66. He admitted, however, that he did not know how the relevant policies concerning such matters were applied to white supervisors. *Id.* "Feelings are not evidence. Without an objectively reasonable basis for those feelings, they are irrelevant." *Wado v. Xerox Corp.*, 991 F.Supp. 174, 203 (W.D.N.Y.1998). Plaintiff has not presented evidence to substantiate his feelings in this regard, and the fact that he is black is not itself a sufficient basis upon which to conclude that he was discriminated against.

Plaintiff also alleges that there were differences in the way that he and other black employees were treated with respect to discipline and rules violations. While plaintiff did identify certain employees in this regard, his testimony did not indicate that the white and black employees involved were similarly situated. The incidents in question involved different types of occurrences and different situations. Moreover, in some instances plaintiff lacked direct knowledge of some of the relevant facts, and he has not submitted evidence to substantiate his allegations. For example, he testified that Art Pagano, a white employee, was caught smoking with a client, but he did not know whether a warning or reprimand was placed in Pagano's personnel file as a result, he did

not know what Hillside's policy was regarding such acts, and he did not know of any black employee who was ever caught smoking with a client. Hines Depo. at 120–21.

■ Likewise, Hines testified about an investigation involving himself and another employee involving the restraint of a child, but he could not remember if the other employee was white or black, nor could he recall if any white employees had been involved in similar situations. Hines Depo. at 125, 130. "To establish disparate treatment, the plaintiff must show membership in a protected class and that a similarly situated nonprotected person was treated differently." *Lees v. Case–Hoyt Corp.*, 779 F.Supp. 717, 727 (W.D.N.Y. 1991).[8] Moreover, "for evidence relating to other employees to be relevant, those employees must be situated similarly to plaintiff." *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1546 (S.D.N.Y.1986), *aff'd,* 814 F.2d 653 (2d Cir. 1987). The Court in *Mazzella* defined similarly situated as "other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the

**8.** The complaint alleges only disparate treatment toward plaintiff. To the extent that plaintiff may be attempting now to raise a "pattern or practice" claim based on his testimony concerning other employees, such a claim is barred by his failure to raise it in his administrative complaint. *See Ong v. Cleland,* 642 F.2d 316, 318 (9th Cir.1981) (plaintiff's administrative charge of discrimination in promotion did not encompass later judicial complaint of constructive discharge, in part because her administrative complaint did not allege that defendant had engaged in pattern or practice of discrimination against plaintiff); *Anyaibe v. Gilbert Security Serv., Inc.,* Civ. A. No. 94–2377, 1995 WL 322452 *5 (D.D.C. May 18, 1995) ("plaintiff's pattern and practice claim could not reasonably be expected to arise out of the allegations in the EEOC charge or affidavit," which only "related to personal discrimination against him ...," and pattern and practice charge was

therefore barred); *Gilliard v. New York Pub. Library Sys.,* 597 F.Supp. 1069, 1079 (S.D.N.Y.1984) (allegations as to general pattern of discrimination by defendant fell outside scope of plaintiff's EEOC charge, which only alleged discrimination against plaintiff, and pattern claim was therefore dismissed); *cf. Sidor v. Reno,* No. 95 Civ. 9588, 1997 WL 582846 *9–10 (S.D.N.Y. Sept.19, 1997) (although plaintiff's EEOC charge alleged only that defendant had discriminated against her personally, later judicial pattern or practice claim was not barred, since record showed that administrative investigation that grew out of plaintiff's EEOC charge included inquiry into plaintiff's allegation made during the course of the investigation that other similarly-situated employees had been discriminated against). In addition, even if such a claim were not barred, I would grant defendant's motion for summary judgment for the reasons already stated.

plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Id.* at 1547. Here, the lack of specifics regarding these incidents, combined with the factual differences between them, render this testimony insufficient to give rise to a genuine issue of material fact.

## B. Ellis Leach

■ Leach's claims all stem from his allegation that he was twice passed over for promotion on account of his race and color, and in retaliation for his having opposed discrimination. Hillside has proffered a legitimate, nondiscriminatory reason for its choice of other candidates for the position sought by Leach: that the decision was based on Diesenberg's assessment of the candidates' relative qualifications.

Greatly undercutting plaintiff's allegations of discrimination and retaliation is the fact that he *was* ultimately promoted to supervisor. *See Shabat v. Blue Cross Blue Shield of Rochester Area,* 925 F.Supp. 977, 987 (W.D.N.Y.1996) (plaintiff's allegation that he should have received promotion sooner than he did failed to make out prima facie case under Title VII), *aff'd sub nom. Shabat v. Billotti,* 108 F.3d 1370 (2d Cir.1997). Leach alleges that the only reason that he ultimately was appointed was because there were no white candidates for the position. But, there is no evidence that Diesenberg only reluctantly appointed Leach to the position. For example, there is no indication that Diesenberg kept the position open longer than usual, or that he actively recruited white employees to apply. In addition, plaintiff does not dispute that Diesenberg actually approached him the second time the supervisor position became available, and asked Leach if he

were still interested. Although Diesenberg ultimately chose Madden for that particular vacancy, he certainly did not discourage plaintiff from applying.

Although Leach denies that Dell or Madden was better qualified for the position than he, it is clear that they had certain qualifications that he lacked.[9] For instance, both Dell and Madden held master's degrees in Counselor Education. Diesenberg Aff. 13 Exs. B, C. Although Leach's own level of education is not apparent from the record, it is undisputed that he did not hold a master's degree. Leach simply states that Dell's degree could not have been a reason why Diesenberg would have preferred her over Leach because a master's degree was not a requirement for the position. That is beside the point, however. In almost any situation involving a job opening, the job requirements simply establish a minimum standard in order to separate the qualified candidates from the unqualified ones. Employers will generally look at factors beyond those requirements as a means of assessing which of the qualified candidates is the *best* qualified. Thus, it was certainly not unreasonable for Diesenberg to view Dell's higher level of education as an asset.

Leach also states that "Ms. Dell did not have four years of supervisory experience at Hillside," Plaintiff's Statement of Disputed Material Facts ¶ 2, disputing Hillside's assertion that she did. Plaintiff, however, has simply made this conclusory allegation, with no evidence to support it, without stating the basis for his knowledge in that regard, and without stating how much experience he believes she did have.

Moreover, what Leach fails to note is that at the time Diesenberg chose Dell, Dell was already a supervisor at another group home, whereas plaintiff was an as-

---

9. I also note that at the time of his deposition (and hence at the time he commenced this action) Leach had almost no knowledge of Dell's or Madden's qualifications. He testified that all he knew about Dell was that "she was a supervisor at Lehigh," and that "Mr. Madden was a relief staff." Affidavit of Todd R. Shinaman (Docket Item 15) Ex. A at 75, 79.

sistant supervisor. It is clear, then, that Dell's prior experience had been at a higher level of authority and responsibility than Leach's.

Leach also disputes Diesenberg's statements that he believed that Madden had better communication skills than Leach, and that Diesenberg was impressed with Madden's work history, which included experience at Hillside in a program working with multi-cultural male youths, and over two years of residential child care experience, and several months of experience in school and hotline counseling. As stated, however, an employee's opinion about his own qualifications does not suffice to give rise to an issue of fact about whether he was discriminated against, and "[t]hat is particularly true where the employer's decision whether to [promote] plaintiff did not depend simply on whether he was qualified, but on whether he was the best candidate for the job." *Layaou,* 999 F.Supp. at 433.

Whether plaintiff considers himself to have been the better candidate, then—indeed, even whether he *was* the better candidate—is not the issue. What matters is why the employer did what it did, not whether it was wise to do so. "Title VII prohibits discrimination, not poor judgment." *Gumbs v. Hall,* 51 F.Supp.2d 275, 282 (W.D.N.Y.1999). *See Montana v. First Fed. Savings and Loan Ass'n of Rochester,* 869 F.2d 100, 106 (2d Cir.1989) (federal courts do not have a "roving commission to review business judgments") (quoting *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 21 n. 8 (7th Cir.1987)); *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.) (courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process"), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Employers should be free to choose the person that they honestly (even if erroneously) consider the better-qualified candidate without being subjected to liability merely because the two candidates are of a different race.

I also find that Diesenberg's decision not to interview Leach after Dell's resignation fails to give rise to an issue of material fact. Since Diesenberg had just interviewed Leach for the same position only three months earlier, there was little prospect that a second interview so soon after the first would have yielded any significant additional information or insights about Leach's qualifications. Furthermore, had Diesenberg already decided that he did not want to give the position to Leach, there would have been no reason for him to ask Leach if he were interested in the job.

Leach also notes that Madden had a "Statement of Concern" in his personnel file. That statement, dated March 28, 1989, indicated that Madden had made allegations about one of his supervisors that were eventually refuted by substantial evidence, and which he later retracted. Madden was warned that "[f]urther actions of this kind on your part may result in your termination of employment with Hillside Children's Center." Leach Aff. Ex. C.

Leach, however, had five "Warning Notices" in his file, dating from 1987 to 1989. These dealt with a number of incidents involving various matters, such as failing to notice that a group home resident was missing, medication—related errors, etc. Several of the notices indicate that future errors of these types could "result in serious disciplinary action, up to and including termination." *Id.* The notices also indicate that for the most part, Leach agreed with the statements made therein. Certainly Diesenberg could have taken these into account in deciding whom to appoint as supervisor.

Leach states in his affidavit that one of his warning notices "reveals the differential treatment given to African–Americans and whites at Hillside" because he was suspended for three days and placed on thirty days' probation, which he claims is more severe than the discipline administered to Chris Schunk in the incident that was the subject of the letter in the matter

concerning plaintiff Hines. Schunk, however, was also given thirty days' probation, and though he was apparently not suspended, the incidents themselves were different; Schunk was disciplined for calling a client a "loser" and swearing at a client, whereas Leach told a client "to step outside and say those words" in response to a verbally abusive client, had briefly locked the client outside when the client did step outside, and after allowing the client back inside, had grabbed him, causing the client's shirt to be torn and leaving two small red marks on his arms. Since the incident involving Schunk involved only verbal abuse, and that involving Leach involved arguably threatening language and physical contact, the two incidents were not at all similar. A comparison of them, however, is of no probative value. Moreover, Leach testified at his deposition that he did not believe that any of the Warning Notices he received were motivated by his race. Shinaman Aff. Ex. A at 170–71.

When asked at his deposition why he believed he was discriminated against on account of his race, Leach testified about incidents that were either the same or similar to those relied upon by Hines concerning alleged disparate treatment of white and black employees. Those allegations also suffer from the same defects as Hines's. For example, Leach testified about the smoking incident concerning Art Pagano, and in general about how incidents involving white employees either were not investigated or did not result in any disciplinary action being taken. As with Hines's allegations in this regard, however, it does not appear that these employees were similarly situated to Leach, nor has Leach presented evidence that minority employees were treated differently in similar situations.

Much of Leach's testimony about perceived racial discrimination is quite vague, and appears to be based upon surmise and hearsay. Much of it also indicates only that Leach thought he was treated poorly in some ways, but he did not show how his race was a factor. For instance, Leach alleged that Diesenberg overworked him in order to "burn [Leach] out," Shinaman Aff. Ex. A at 36, but he was unable to explain how his race was involved. Leach stated that he thought that his complaints about incidents involving white staff members was a factor, but there is no objective evidence to support that allegation.

Leach also testified that he had heard through "the grapevine" "that [Leach] wasn't the candidate that they were going to select" for the supervisor position, *id.* at 41, and that he was going to be terminated along with Hines (which, of course, did not happen). *Id.* at 42. Likewise, he stated that "[i]t was out in the grapevine," and "it was out there" that Madden had been sent to Alexander "to deal with [Leach] in some manner. In a negative sense," *id.* at 90, but he could not remember who told him that. Aside from being rank hearsay, none of this has any apparent connection to Leach's race.

Aside from his conclusory allegations and subjective opinions about his qualifications, then, in opposition to defendant's motion plaintiff relies on little more than the evidence that he has presented to establish his prima facie case: that he is black, and that Diesenberg, a white male, chose a white female and then a white male for the supervisor position, before eventually choosing Leach as a supervisor. Absent evidence suggestive of unlawful discrimination, that is not enough to defeat Hillside's motion. *See Dinolfo v. Rochester Telephone Corp.*, 972 F.Supp. 718, 726 (W.D.N.Y.1997) ("As the Second Circuit recently made clear ... the fact that plaintiff may have made out a prima facie case is not necessarily enough for her to prevail on her claim") (citing *Fisher v. Vassar*, 114 F.3d 1332, 1337 (2nd Cir. 1997)).

The fact that Dell and Madden are white is insufficient, by itself, to give rise to an inference of discrimination. "That [the person who was selected] is of another race, sex, or age may help to raise an

inference of discrimination, but it is neither a sufficient nor a necessary condition." *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996). *See Gumbs,* 51 F.Supp.2d at 280 (fact that white male defendant selected another white male for position sought by black female plaintiff, though establishing prima facie case, was insufficient to defeat defendants' summary judgment motion); *McGraw v. Wyeth–Ayerst Labs., Inc.,* No. CIV.A. 96–5780, 1997 WL 799437 *7 (E.D.Pa. Dec. 30, 1997) (replacement of female employee with male employee after she was terminated is not enough to demonstrate disparate treatment or raise inference of unlawful discrimination under Title VII); *Hill v. Burrell Communications Group Inc.,* No. 92 C 8343, 1995 WL 76881 *5 (N.D.Ill. Feb. 17, 1995) (by itself, assertion that plaintiff was replaced by black person only satisfies part of plaintiff's burden to make a prima facie case, and does not permit inference of discriminatory animus), *aff'd,* 67 F.3d 665 (7th Cir.1995); *Brown v. Herman's Furniture, Inc.,* 772 F.Supp. 350, 356 (N.D.Ohio 1990) (fact that black female plaintiff was replaced by white male "add[s] nothing beyond establishing plaintiff's prima facie case"), *aff'd,* 941 F.2d 1209 (6th Cir.1991).

I conclude, then, that Leach has failed to carry his burden of showing the existence of any genuine issue of material fact relating to his discrimination claims. That leaves only his Title VII retaliation claim.

■ To establish a prima facie case of retaliation under Title VII, a plaintiff must show that he engaged in activity protected by Title VII, that defendant was aware of the activity, that plaintiff was subjected to an adverse employment action, and that there is a causal connection between the protected activity and the adverse action. *Tomka v. Seiler,* 66 F.3d 1295, 1308 (2d Cir.1995). "Proof of a causal connection can be established indirectly by showing

that the protected activity was followed closely by discriminatory treatment, ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, ... or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) (citations omitted).

■ The complaint alleges that Leach was twice passed over for promotion in retaliation for his opposition to Hillside's treatment of Hines and because he had testified on behalf of Hines in Hines's DHR proceeding. This claim suffers from a number of defects. First, Hines filed his DHR complaint on November 4, 1991. The promotion decisions in question concerning Leach, however, were both made *prior* to that date. Although the record does not appear to reveal exactly when Leach testified for Hines, it was certainly *after* Diesenberg selected Dell and Madden to fill the supervisor position.[10]

■ Leach also alleges that he was retaliated against for having voiced his opinion that Hines had not been treated fairly. Plaintiff has not presented any evidence, however, that he ever said to anyone at Hillside that he thought that Hines had been mistreated on account of his race. Although the complaint makes that allegation, to defeat a motion for summary judgment plaintiff must do more than rest on the allegations in his complaint; he must come forward with "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("a party may not rest on the bare allegations of a pleading to defeat a properly submitted motion for summary judg-

---

10. Hillside alleges that it first learned that Hines had filed an administrative charge on November 11, 1991. Leach responds that that is an issue of fact. Since the DHR com-

plaint was filed after the two promotion decisions at issue, however, that issue is not material to Leach's claims.

ment"); *accord Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Leach testified at his deposition that he expressed his belief that a "lot of the things that they were saying about Jerry [Hines] were lies," that "Jerry was being set up," that "they were trying to hang Jerry out to dry ...," Shinaman Aff. Ex. A at 38, 39, 40. But Leach never said that these things were occurring because of Hines's race. Similarly, in his affidavit in opposition to Hillside's motion for summary judgment, Leach states, "I expressed my opinion that [Hines] had been treated unfairly by Hillside to Diesenberg and others at Hillside," and that Leach "had expressed [his] support for Jerry Hines during the period of time before he was terminated," Leach Aff. ¶¶ 4, 5, but he does not state that he ever raised the issue of race discrimination.

■ Even assuming *arguendo* that plaintiff's allegation in his complaint that he had complained that Hines was being discriminated against on account of his race is sufficient to give rise to a genuine issue of fact about whether Hines engaged in protected activity, his claim nevertheless fails for the same reason that his race discrimination claims fail: he has not come forward with evidence showing that any genuine issues of fact exist about whether Hillside's proffered reasons for choosing Dell and Madden for supervisor instead of Leach are pretextual. Again, the fact that Diesenberg did ultimately promote Leach to supervisor greatly undercuts the force of his allegations, and the evidence shows that both Dell and Madden were better qualified than Leach in some respects.

About the only evidence that plaintiff has to support this claim is the temporal proximity between Hines's termination and Diesenberg's selection of Dell rather than Leach. It is true that a "strong temporal correlation" between an employee's protected activity and an adverse job action can constitute some evidence of a retaliatory motive. *Quinn,* 159 F.3d at 769–70.

On the facts before me, however, I do not believe that the sequence of events here, by itself, will support an inference that defendant's proffered reasons for selecting Dell and Madden are pretextual.

First, I note that given the facts of this case, it was inevitable that the relevant events—Hines's termination and the selection of a new supervisor—would be temporally close, since it was Hines's departure that created the supervisor vacancy in the first place. Therefore, the temporal proximity of these events is less significant than in *Quinn,* where the plaintiff was fired just ten days after she filed a charge with the DHR. In *Quinn,* the subject of the plaintiff's complaints—sexual harassment—did not create the situation that led to the plaintiff's termination. In the case at bar, however, the events about which plaintiff had complained to Hillside, *i.e.* Hines's termination and the events that led up to it, made it inevitable that relatively soon thereafter, someone new would be appointed as supervisor, The temporal proximity of the relevant events here is in some ways therefore unremarkable.

Another distinction between the instant case and *Quinn* is that in *Quinn,* the plaintiff was actually fired. Here, however, Diesenberg *had* to choose *someone* to fill the supervisor position vacated by Hine's termination. The employer in *Quinn* was not forced to decide whether to fire the plaintiff, an act that evidenced an obvious desire simply to be rid of the plaintiff, for whatever reason. The fact that the employer fired Quinn just days after she filed her DHR complaint therefore supposed that one may have been related to the other. In the case at bar, on the other hand, Diesenberg was forced to choose between two candidates, and he simply did not choose Leach. Under plaintiff's logic, then, once Leach had allegedly complained that Hines had been discriminated against, Leach had no choice but to select Leach as the next supervisor if he did not want to expose himself or Hillside to liability for Title VII retaliation.

I conclude, therefore, that even if Leach has made out a prima facie case of retaliation with respect to Hillside's failure to promote him sooner, he has not shown that there are any issues of fact about whether Hillside's proffered reasons for that failure are a pretext for discrimination. Leach's only evidence relies upon the *"post hoc, ergo propter hoc"* fallacy, and is not enough to defeat Hillside's motion. *See Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 272 (8th Cir.1996) (temporal connection between filing of EEOC complaint and plaintiff's firing could not prove that employer's proffered reason for firing was pretext for retaliation); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (timing of plaintiff's sexual-harassment complaint, standing alone did not create genuine issue of fact as to causal connection between plaintiff's filing of complaint and her subsequent termination); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir.) (timing alone will not suffice to prove retaliatory motive), *cert. denied*, 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Vails v. Police Dep't of the City of New York*, 54 F.Supp.2d 367, 368 (S.D.N.Y. July 15, 1999) (plaintiff "has not shown that the timing of her filing of her [administrative] complaint ... and the request for her termination ... was anything but a coincidence"); *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 291 (S.D.N.Y.1998) (recognizing that under *Quinn*, temporal proximity (two months) between plaintiff's filing of EEOC charge and his termination sufficed to establish causal nexus for purposes of prima facie case, but nevertheless granting defendant's motion for summary judgment on ground that plaintiff had not offered concrete evidence upon which a reasonable jury could return a verdict in his favor); *Bainlardi v. SBC Warburg, Inc.*, No. 97CIV.2861, 1998 WL 556032 *6 (S.D.N.Y. Sept. 1, 1998) ("Although the sequence and timing of events, alone, creates an 'inference of discrimination' sufficient to satisfy plaintiff's burden in the first step of the *McDonnell Douglas* analy-

sis, the mere fact that a protected action preceded an adverse employment action is not, by itself, sufficient to satisfy plaintiff's burden at the third step of the *McDonnell Douglas* analysis"); *Aviles v. Chase Manhattan Bank*, No. 94 Civ. 8544, 1998 WL 477967 *1 (S.D.N.Y. Aug. 14, 1998) ("The plaintiff points to no authority that contradicts the proposition that the close proximity of a termination alone is insufficient to demonstrate pretext"; citing cases that support that proposition); *Brown v. Coughlin*, 965 F.Supp. 401, 406 (W.D.N.Y. 1997) ("the mere fact that a defendant took some action after plaintiff had filed an administrative complaint, standing alone, cannot support a claim against that defendant"); *Reilly v. Metro-North Commuter R.R. Co.*, No. 93 Civ. 7317, 1996 WL 665620 *14 (S.D.N.Y. Nov. 15, 1996) (timing of events alone, even if sufficient to meet plaintiff's *prima facie* burden of showing retaliation, could not defeat defendant's summary judgment motion); *Hollek v. Romines*, No. C96–0852, 1996 WL 532133 *6 (N.D.Cal. Sep. 12, 1996) (timing alone was insufficient to support inmate's retaliation claim).

■ Hines also alleges that Hillside retaliated against him by giving him a negative evaluation in May 1992. This evaluation was prepared by Madden. This allegation, too, is flawed in a number of respects, one of which is that it is not alleged in the complaint (although it was contained in Leach's DHR complaint; *see* Shinaman Aff. Ex. B). *See Querry v. Messar*, 14 F.Supp.2d 437, 442 (S.D.N.Y. 1998) (refusing to consider plaintiff's allegations that were not contained in her complaint).

Even overlooking that problem, however, this claim must be dismissed. First, I do not believe that this single review, which simply pointed out several areas in which Leach needed to improve, could be found to constitute an adverse job action for purposes of a Title VII retaliation claim. *See Castro v. New York City Bd. of Educ. Personnel*, No. 96 CIV. 6314, 1998

WL 108004 *7 (S.D.N.Y. Mar 12, 1998) ("Courts have held that negative evaluations ... that are unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions"); *Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y.1993) (since plaintiff's midyear evaluation of "unacceptable" did not affect terms, privileges, duration or condition of plaintiff's employment, it did not constitute adverse job action for purposes of Title VII); *see also Shabat,* 925 F.Supp. at 989 (alleged discipline of plaintiff consisting of being "written up," which apparently meant that negative report was placed in his personnel file, was "too inconsequential to support an action under Title VII").

In addition, plaintiff has presented no evidence that Madden was motivated in any way by anything plaintiff did on behalf of Jerry Hines. Madden had not been involved in any of the incidents involving Hines. Leach speculated at his deposition that Madden was under instructions "to start to deal with me in some manner. In a negative sense." Shinaman Aff. Ex. A at 90. Although an earlier performance evaluation prepared by Madden in December 1991 (which was also after Hines had been terminated and filed his administrative complaint) was quite positive, Leach theorized that someone at Hillside decided that Madden had been "failing to do the job" that he was sent to Alexander to do, so Madden was told to make the next evaluation more negative. *Id.*

Leach was completely unable, however, to identify his source of this information. He stated, "I received information—I can't remember from who—that Mr. Madden was sent down to Alexander to do a job and he was failing to do the job." *Id.* He also said that this information was "out in the grapevine. ... [I]t was out there." *Id.*

In short, Leach's allegation that Madden gave him an unfavorable review because of Leach's activities on behalf of Hines rest upon nothing but hearsay and speculation. Even if that review could be considered to be an adverse job action, therefore, this claim fails.[11]

## C. Melanie E. Burton and Keith Webb

 Burton's and Webb's claims both arise from the selection of Wayne Wiggs for supervisor at Arnett. In both cases, Hillside's proffered reason for choosing Wiggs is that Diesenberg believed that Wiggs was the best candidate for the position, based both on Diesenberg's own assessment of Wiggs's credentials and on the results of the team interview process.

In opposition to defendant's motion for summary judgment, Burton and Webb have presented virtually no evidence at all that this proffered reason is in fact a pretext for race or sex discrimination. They have done little but point to some trivial alleged inconsistencies or lapses of memory in Diesenberg's deposition testimony, and make vague, conclusory allegations that the team interview process was nothing but a sham and that Diesenberg had already made up his mind to hire Wiggs because Wiggs is white.

Burton herself believed that "Wayne [Wiggs] did very well during the interview...." Affidavit of Todd R. Shinaman (Docket Item 12) Ex. A at 33. She also testified that at least until he chose Wiggs for the supervisor position, she believed that Diesenberg had always treated her fairly. *Id.* at 78.

In fact, Burton attempts to use the fact that Diesenberg had consistently given her excellent performance reviews as evidence of discrimination. Apparently the logic here is either that: these reviews show

---

11. As with Hines, Leach now alleges that there is a "pattern and practice of discrimination against African–Americans ..." at Hillside. Leach Aff. ¶ 21. Also like Hines, Leach failed to raise any such allegation in his HRL complaint. *See* Shinaman Aff. Ex. B. For the same reasons stated with respect to Hines's allegations in this regard, I find that Leach is barred from asserting a pattern-and-practice claim here.

that Burton *was* an excellent candidate and in fact better than Wiggs; or that Diesenberg gave her good reviews in order to cover up his discriminatory feelings toward her. Not only are plaintiff's allegations so vague and lacking in apparent relevance that it is difficult to figure out how they are even supposed to be significant, but plaintiff seeks to put defendants in a "Catch-22" situation. If the employer gives an employee a good performance evaluation, that is somehow supposed to be probative of the employer's discriminatory animus, yet if the employer gave the employee a poor evaluation, plaintiffs would no doubt contend that the employer did so because of discrimination, or to justify taking some action against the employee later on.

There is little to say about Burton's claim of sex discrimination, since she has said virtually nothing about it herself. In short, there is simply no evidence to support this claim.

Webb fares no better. He stated at his deposition that he did not believe that race was a factor in the team interview process, in which Wiggs ranked highest. Shinaman Aff. Ex. B at 50, 72. He testified that the main reason that he believed race was a factor in Diesenberg's selection of Wiggs was Diesenberg's "inability to explain to" Webb that Wiggs's hiring was based on anything other than race when Webb spoke to Diesenberg afterwards. *Id.* at 77. Neither Webb nor Diesenberg brought up the subject of race during that discussion, however. *Id.* at 77–78. One can hardly expect Diesenberg to have volunteered that race had not played a part in his decision when the subject had not even been broached.

Webb also alleges that Diesenberg either discriminated against or did not get along with certain other black males at Hillside, but he is unaware of the details of the situations involved, and his allegation that racial discrimination played a part are wholly conclusory. They do not create a genuine issue of material fact.

Plaintiffs also contend that Diesenberg's deposition testimony indicates that the team interview process had nothing to do with his decision to hire Wiggs. All that Diesenberg stated was that ultimately the decision was up to him, which is true. Defendant has never contended that Diesenberg was bound by the final team rankings.

Equally unpersuasive is plaintiffs' contention that the problem with Wiggs's driving record is somehow probative of discrimination. Had Wiggs been unconditionally hired in *spite of* his driving record, that might be some evidence of pretext, at least if plaintiffs could show that blacks or females were not hired or promoted in similar circumstances, or that this was done in violation of Hillside policy. But Wiggs's appointment was made conditional upon his obtaining insurance company approval. There is nothing remarkable about any of that.

I also note that the administrative committee, three of whose five members were black, rejected plaintiffs' challenges to the decision to hire Wiggs. While that is not conclusive on the issue of discrimination, it does show that this was not just the decision of one white male.[12] This was a multistep process involving numerous people, and at every level the hiring of Wiggs was found to be a fair decision.[13]

---

**12.** For the reasons stated with respect to Hines, I also find that Burton's and Webb's newly-raised claims of a pattern and practice of discrimination at Hillside, neither of which were raised in their HRL complaints, *see* Affidavit of Todd R. Shinaman (Docket Item 27) Exs. A, B, are barred.

**13.** There being no federal claims remaining in any of these cases, I decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c); *see Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990).

## CONCLUSION

Defendant's motions for summary judgment in *Hines v. Hillside Children's Center*, 96–CV–6203L (Docket Item 14), *Leach v. Hillside Children's Center*, 98–CV–6038L, and *Burton v. Hillside Children's Center*, 97–CV–6326L (Docket Item 11), are granted, and the complaints are dismissed with prejudice.

IT IS SO ORDERED.