Michael KODENGADA, Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.

No. 98 Civ. 6545(BDP).

United States District Court, S.D. New York.

March 13, 2000.

---

Jeffrey Marder, Alpert & Kaufman, New York City, for plaintiff.

John Pope, Davis Weber & Edwards, New York City, for defendant.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

Plaintiff Michael Kodengada ("Kodengada"), who is Indian and a member of the Hindu religion, brings this action against his former employer, defendant International Business Machines Corporation ("IBM"), alleging discrimination based on national origin, race and religion and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, et seq., and New York State Executive Law § 290, et seq. Before this Court is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). For the reasons stated below, defendant's motion is granted.

### BACKGROUND

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for sum-

mary judgment, "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986)). The following facts are construed accordingly.

On March 18, 1996, IBM hired plaintiff Michael Kodengada as an Information Technology ("IT") architect. Kodengada was assigned to a project team, led by Frank DeRobertis, who served as team manager from the time Kodengada was hired until December of 1996. While Kodengada had an office at the IBM facility in Poughkeepsie, New York, he also worked at various other IBM sites and facilities. It was at one of these other sites that Kodengada alleges he was subjected to race-based hostile environment harassment.

From June 1996 through November 1996, Kodengada claims that when he visited the "war room," an open workspace in the Somers, New York facility, he was subjected to repeated harassment, in the form of racist remarks directed at him by a co-worker named George Baschiera. Kodengada went to the war room about two times a week for a few hours at a time. While there, Kodengada claims he was exposed to the following incidents:

- Baschiera told him that he did not believe in educating immigrants.
- Baschiera told him that he did not believe that Hare Krishna was a real religion.
- Baschiera said that he kept a gun in his boot "when he goes to Manhattan in case any colored guy approach him, shoot him, just like Mr. Bernard Goetz did, he supported him." [sic]
- Baschiera expressed an opinion supporting Bob Grant, WABC's conservative radio talk show host, when Grant

was fired for making allegedly racist remarks.

- Baschiera used profanity to refer to the chief architect who was late for a meeting.
- In the course of a telephone conversation, an African–American co-worker, Ron Wood, said that he had gotten a tan while at a training class in Texas. Baschiera replied, "Were you a white boy before going to Houston, Texas, and now turn out to be a black boy?"

Kodengada claims he complained to DeRobertis in August of 1996 about Baschiera's offensive behavior and his disdainful comments about immigrants. DeRobertis denies that Kodengada complained to him about any such remarks before November of 1996. Kodengada also claims that he complained about Baschiera's alleged derogatory remarks to the Human Resources ("HR") Department.

In November 1996, Kodengada became angry at Baschiera because he believed Baschiera had wrongfully interfered with one of Kodengada's projects. On Sunday November 3, 1996, Kodengada sent an e-mail to Baschiera entitled "Intelligent Methods Are Best," accusing Baschiera of (1) talking to one of Kodengada's customers without permission, (2) having a "police officer character," (3) making racist comments towards an African–American co-worker, and (4) speaking badly about their manager. Kodengada forwarded this e-mail to DeRobertis. Upon receiving the e-mail, Baschiera complained to DeRobertis and demanded that Kodengada apologize.

DeRobertis claims he previously had experienced problems with Kodengada, including complaints about the quality of his work, a complaint about a sexually explicit story that plaintiff wrote and left on a printer which an IBM secretary discovered, and complaints from female employees that Kodengada had offended or intimidated them. Kodengada admits to printing a personal story using an IBM printer. DeRobertis learned, through his own in-

vestigation, that three women, Jill Alibrandi, JoAnne Martin, and Kathy Celona, had experiences with Kodengada that they found intimidating and/or offensive. Kodengada subsequently confronted one of the women who had complained about his behavior, leading DeRobertis to admonish him.

In November, DeRobertis began consulting with Human Resources to determine how to address the conflict between Kodengada and Baschiera. In an effort to address the problem, DeRobertis held a meeting in his office on November 6, 1996, attended by Kodengada and Baschiera. During the meeting, there was a heated exchange between the two men. The defendant claims that Baschiera was upset with plaintiff and told him he could be subjected to charges of harassment for his conduct towards several women. Kodengada claims that Baschiera shouted at him "Mike, I will sink you at IBM! I will bring sexual harassment charges against you! I will destroy you!" Baschiera again demanded an apology for the November 3rd e-mail.

That same day following the meeting, the men continued to communicate through e-mail. Baschiera received an e-mail containing an apology for the comment made at the meeting, which apparently was sent from Kodengada's computer. Kodengada claims he did not write the e-mail, but rather that DeRobertis composed and sent it from Kodengada's terminal. In another e-mail, DeRobertis scolded Kodengada about the inappropriateness of his behavior, including the e-mail sent to Baschiera, and the conduct that had offended some women.

Kodengada also discussed the situation with the HR Department. Following the November 6th meeting, he initially spoke with Joan Esser, a diversity program manager in the HR Department, and later with Jill Atschinow ("Atschinow"), the human resources advisor for his department. The parties dispute who contacted whom. Kodengada alleges that Atschinow contacted him at work on November 7th and called him at home on November 8th. During their conversations, Kodengada complained to Atschinow about Baschiera's behavior at the meeting and about the apology letter. Atschinow arranged a meeting between Kodengada and his Second Line Manager, Wes Thompson, which occurred on Monday, November 11. At that meeting, Kodengada again discussed his problems on the job, including his run-ins with Baschiera.

IBM asserts that Atschinow thoroughly investigated the incidents that occurred in early November and determined that Kodengada had not been treated unfairly.

After consulting with the HR Department, DeRobertis placed Kodengada "on notice" for his conduct in November of 1996. Kodengada received and read a copy of the "on notice" document, which stated that any subsequent instances of inappropriate or unprofessional conduct could result in termination of employment without any further warnings. DeRobertis also sent Kodengada an e-mail outlining procedures that Kodengada should use in communicating with his co-workers. The November 3, 1996 e-mail sent to Baschiera also was included in Kodengada's file.

Kodengada admits that things went smoothly for him at work from mid-November of 1996 until late March of 1997, when his problems began again. Charles Hill had taken over the department and become Kodengada's new manager on January 1, 1997. In an affidavit submitted in support of defendant's motion for summary judgment, Hill states that he made the decision to terminate Kodengada's employment based on three incidents of unprofessional and inappropriate conduct by Kodengada that occurred in late March and early April of 1997.

Hill states that the first incident occurred on March 26, 1997, when Kodengada's co-worker Tara Kenny complained to Hill about a phone call Kodengada placed to her on March 25. Kenny claimed that Kodengada, without identifying himself, asked her whether she found Kodengada

attractive. Kenny told Hill that Kodengada subsequently identified himself but proceeded to tell her that he knew what kind of car she drove and exactly where in Connecticut she lived. Kenny terminated the call and informed Hill that she was disturbed by Kodengada's behavior. Kodengada has no knowledge of any report made by Kenny to Hill concerning inappropriate and unprofessional conduct, and denies that he acted in such a manner.

The second incident happened on March 26, 1997. On that day, IBM security responded to a complaint from the cafeteria at the Poughkeepsie site stating that a man, apparently Kodengada, had been brushing up against female patrons in the serving line, and had caused a disturbance by complaining about and refusing to pay for food. Kodengada was interrogated by IBM security, which notified Hill of the incident the next day. Kodengada denies that he acted in an unprofessional or inappropriate manner and claims that he received food poisoning from the cafeteria food and went back to the cafeteria to complain to the chef. Hill contacted the HR department to determine how to handle Kodengada.

Finally, on April 2, 1997, Hill received a complaint from project manager Gary Sills concerning several incidents involving Kodengada. Sills informed Hill that Kodengada had missed a number of conference calls in connection with a new project, had been disruptive on one conference call, and had not been contributing to Sills' project. Sills also told Hill that Kodengada verbally berated him and his wife during a telephone call made to their home on April 1, 1997, by accusing them of lying to Kodengada. Kodengada has no knowledge of any report made by Sills to Hill concerning inappropriate and unprofessional conduct, and denies that he acted in such a manner. Hill claims that as a result of these incidents, he fired Kodengada on the afternoon of April 2.

On September 26, 1997, Kodengada filed a discrimination complaint with the United States Equal Employment Opportunity Commission ("EEOC"). On May 11, 1998, the EEOC concluded that the evidence in Kodengada's case revealed no violation of any anti-discrimination statute. The EEOC noted that "[a] further review of the evidence, specifically, your e-mail on November 3, 1996 to your co-worker indicates that this matter appears to be a personality clash with your co-worker(s)." Declaration of John Houston Pope, Exh. 2.

Nevertheless, the EEOC issued a right to sue notice and plaintiff commenced this action by filing a summons with Notice in New York state court on July 22, 1998. IBM was served with the Summons on August 21, 1998 and demanded service of a Complaint. Upon receipt, IBM removed the case to this Court on September 16, 1998.

## DISCUSSION

### I  Summary Judgment

The Federal Rules of Civil Procedure mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial". *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Although in reviewing the record, this Court must assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in [his] favor," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990), the mere existence of an alleged factual dispute between the parties will not defeat a motion for summary judgment. *Terry v. United States*, No. 98 Civ. 8249(NRB), 2000 WL 204522, at *3 (S.D.N.Y. Feb.18, 2000). Rather, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute about a material fact is "genuine ... if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In considering this summary judgment motion, this Court must proceed cautiously because, in a workplace discrimination case such as this, the allegations usually require inquiry into the employer's true motivation for and subjective intent in making the challenged employment decision. *See Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984); *Terry*, 2000 WL 204522, at *3. At the same time, the plaintiff is not relieved of the responsibility of producing sufficient evidence from which a reasonable juror could return a verdict in his favor. *Terry*, 2000 WL 204522, at *3; *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (1986); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Lane v. Sotheby Parke Bernet, Inc.*, 758 F.2d 71, 72 (2d Cir.1985).

## II Hostile Environment Claims

### A The Federal Claim is Time–Barred

■ Title VII provides, in relevant part, that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged act of discrimination. *See* 42 U.S.C. § 2000e–5(e)(1); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998); *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 132 (2d Cir.1996); *Ford v. Bernard Fineson Development Center*, 81 F.3d 304, 307 & n. 6 (2d Cir.1996); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996). This statutory requirement functions as a statute of limitations, *Van Zant*, 80 F.3d at 712, in that discriminatory incidents not timely brought before the EEOC will be time-barred in federal court. *See Butts v. City of New York*, 990 F.2d 1397, 1401 (2d Cir.1993).

Kodengada did not file a charge of discrimination with the EEOC until September 26, 1997 and there is no reference of plaintiff filing a charge with any state or local equal employment agency before filing with the EEOC. Thus, only events that occurred during the 180 day period before filing—that is, on or after March 30, 1997—are actionable under Title VII. All of the events comprising plaintiff's hostile work environment claim occurred between June 1996 and November of 1996. Therefore, Kodengada's asserted federal claim on the alleged hostile work environment is time barred because it involves events that were not the subject of a timely EEOC claim.

### B State Law Claim

■ Based on the same alleged racial discrimination, Kodengada also brings a claim under the New York State Human Rights Law ("HRL"), N.Y.Exec.Law § 296. In contrast to the Title VII claim, Kodengada's state law hostile environment claim is not time barred. The statute of limitations for the state hostile environment claim is three years. *See* N.Y.C.P.L.R. § 214(2); *Van Zant* 80 F.3d at 714.

Although this Court is dismissing Kodengada's Title VII claim, we exercise our discretion under 28 U.S.C. § 1367(c) to retain supplemental jurisdiction over his HRL claim "based on judicial economy and the close relationship between [his] federal and state claim." *Richardson v. Newburgh Enlarged City Sch. Dist.*, 984 F.Supp. 735, 747 (S.D.N.Y.1997); *see also Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir.1994) (a district court may "continue to exercise jurisdiction over a state claim

even when the federal claim to which it is pendent has been dismissed before trial" where it entertains "a summary judgment motion that offer[s] some prospect of ending the litigation entirely.").

New York Human Rights Law provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice ... for an employer ... because of the age, race, creed, color, national origin, sex, disability, genetic predisposition or carrier status, or marital status of an individual ... to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y.Exec.Law § 296(1)(a). New York courts require the same standard of proof for claims brought under the Human Rights Law as for those brought under a Federal Title VII claim. *See Quinn*, 159 F.3d at 765; *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); *Sobol v. Kidder, Peabody & Co.*, 49 F.Supp.2d 208, 222 (S.D.N.Y.1999). The elements of a successful employment discrimination claim under New York and federal law are "virtually identical." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 479, 102 S.Ct. 1883, 1896, 72 L.Ed.2d 262 (1982).

■ The Supreme Court has interpreted a Title VII hostile environment to encompass "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Thus, to prevail on such a claim, a plaintiff must demonstrate: (1) that his workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Harris*, 510 U.S. at 21, 114 S.Ct. 367, and (2) "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (internal quotations omitted); *see also Van Zant*, 80 F.3d at 715 (citing *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995)). The inquiry under the first prong of this test has both objective and subjective components. *Harris*, 510 U.S. at 21, 114 S.Ct. 367. To satisfy the objective component of the analysis, the conduct must be offensive or pervasive enough to create an environment that a reasonable person would find hostile or abusive. *Id.* Similarly, the victim must actually perceive her employment environment as abusive. *Id.* Whether the environment may be considered sufficiently hostile or abusive to support such a claim is to be measured by the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance. *See Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir.1999); *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

For racist comments, slurs and jokes to constitute a hostile work environment, plaintiff must show "more than a few isolated incidents of racial enmity." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986). Whether racial slurs constitute a hostile work environment depends on the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment. *Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir.1997) (citations omitted). "There must be a steady barrage of opprobrious racial comments," and evidence solely of "sporadic racial slurs" does not suffice. *Id.* at 110. In addition, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (internal quotations and citations omitted).

■ Kodengada bases his hostile work environment claim on six comments made by Baschiera over a period of seven months. Kodengada only worked with

Baschiera a few days a week, for a few hours in total. The infrequency and lack of severity of the alleged discriminatory conduct defeats Kodengada's claim. The comments made by Baschiera did not involve any physical threat or humiliation towards Kodengada. Baschiera allegedly referred to an African–American co-worker as a "black boy." However, "a derogatory comment about another person generally does not have the same sting as an ethnic slur directed at a minority group member." *Heitzman v. Monmouth County*, 321 N.J.Super. 133, 148, 728 A.2d 297, 305 (1999). Offensive comments, such as using profanity to refer to a co-worker, does not rise to the level required to demonstrate a discriminatory hostile work environment. Kodengada has not demonstrated that his workplace was "permeated" with discriminatory incidents.

The alleged incidents do not give rise to a triable issue of fact concerning the existence of a hostile work environment. Kodengada's encounters with Baschiera largely reflected a clash of personalities rather than a discriminatory animus. *See, e.g., Shabat v. Blue Cross Blue Shield*, 925 F.Supp. 977, 982 (W.D.N.Y.1996) (granting summary judgment on hostile environment claim where many of the incidents "involved nothing more than occasional brief comments, some of which reflected a clash of personalities more than a discriminatory animus."); *see also Valdez v. Mercy Hospital*, 961 F.2d 1401, 1403 (8th Cir.1992) (personality conflicts between co-workers and plaintiff did not rise to the level or severity or pervasiveness necessary to demonstrate a discriminatorily hostile work environment). "Title VII ... is not a shield against harsh treatment at the workplace." *Shabat*, 925 F.Supp. at 984.

Prong two of the test requires that Kodengada demonstrate "that a specific basis exists for imputing the conduct that created the hostile environment" to his employer, IBM. *Schwapp*, 118 F.3d at 110. Kodengada alleges, *inter alia*, that DeRobertis' actions in failing to remedy his conflict with Baschiera satisfy this requirement. We disagree.

Kodengada fails to satisfy this requirement because the allegedly discriminatory incidents on which Kodengada bases his claim are all attributable to a co-worker, not a supervisor. In cases where the hostile work environment is attributable to a co-worker and not a supervisor, the plaintiff must demonstrate that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Van Zant*, 80 F.3d at 715. In *Shabat*, the plaintiff's supervisor tried to resolve what he considered a clash of personalities caused by cultural differences between plaintiff and his co-workers. *Shabat*, 925 F.Supp. at 984. Here, DeRobertis, made similar attempts by organizing the meeting in his office on Nov. 6th and counseling Kodengada about communications with co-workers. Kodengada admits that Baschiera made no further remarks after November 3, 1996, the date of Kodengada's alleged complaint.

Furthermore, Kodengada complained to IBM's Human Resources Department, which investigated his complaints and arranged meetings to address his problems. Kodengada has provided no evidence that IBM encouraged or approved the alleged acts by Baschiera. Thus, the conduct cannot be imputed to IBM. Accordingly, Kodengada cannot sustain a claim of racially discriminatory hostile work environment under Title VII or New York Human Rights Law § 296.

### III  Retaliation Claim

Kodengada brings his retaliation claim under Title VII and N.Y.Exec.Law § 290 et seq. Under Title VII, it is unlawful for an employer to discriminate against an employee "because he opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (1994).

Similarly, New York's Executive Law prohibits the discharge of employees in retaliation for their opposition to discriminatory practices or their participation in an investigation under the New York Human Rights Law. Because New York courts rely on federal law when determining claims under New York Human Rights Law, this Court will consider Kodengada's New York retaliatory discharge claim in tandem with his Title VII retaliatory discharge claim. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1177 (2d Cir.1996).

"Retaliatory discharge in violation of Title VII occurs when a retaliatory motive plays a part in the discharge, whether or not it was the sole cause or when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exists." *Id.* at 1178–78 (internal quotations omitted). The burden-shifting analysis applies to retaliation claims under Title VII. *Id.* Our Circuit has summarized these burden-shifting rules, in the context of a defendant's motion for summary judgment directed at a plaintiff's retaliation claim, as follows: On a motion for summary judgment, (1) plaintiff must demonstrate a prima facie case of retaliation, (2) defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of action, and (3), if the defendant meets its burden, plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation. *Quinn,* 159 F.3d at 764 n. 5; *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998); *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 120–21 (2d Cir.1997); *Tomka,* 66 F.3d at 1308.

■ To make out a *prima facie* case of retaliation, plaintiff must show: (1) participation in a protected activity; (2) the employer was aware of the protected activity; (3) an employment action disadvantaging the plaintiff, and (4) a causal connection between the protected activity and the ad-

verse employment action. *Quinn,* 159 F.3d at 768; *Gallagher,* 139 F.3d at 349; *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998); *Reed,* 95 F.3d at 1178; *Terry v. United States,* 2000 WL 204522, at *8.

Plaintiff claims that he was fired because he complained to DeRobertis and the Human Resources Department about Baschiera's racist remarks. Specifically, plaintiff asserts that the protected activity includes the November 3, 1996 e-mail that Kodengada sent to Baschiera and then forwarded to DeRobertis. Defendant claims, however, that these complaints of discrimination had nothing to do with Kodengada's firing. Rather, defendants assert that he was discharged because of his repeated inappropriate behavior towards women, and problems in his job performance. Defendants specifically point to the three incidents that occurred from March 25 to April 1, the week before Kodengada's firing.

Plaintiff satisfies the first three requirements for establishing a prima facie case of retaliation. The requirements most easily satisfied are (2), that the defendant was aware of Kodengada's protected activity, because the complaints were made to his supervisor and Human Resources; and (3) because defendant suffered an adverse employment action when he was fired.

■ Requirement (1), that defendant engage in protected activity, i.e. opposition to an unlawful employment practice, is also satisfied. Although this Court has found that Baschiera's comments did not sustain Kodengada's hostile environment claim, Kodengada's complaints about those comments were protected activity. *See Reed,* 95 F.3d at 1178. "An employee need not establish that the conduct [he] opposed was in fact a violation of Title VII, but rather, only that [he] had a good faith, reasonable belief that the underlying employment practice was unlawful." *Id.; see also Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) ("[P]laintiff

must demonstrate a "good faith, reasonable belief" that the underlying challenged actions of the employer violated the law."). In determining whether a plaintiff's belief was reasonable, a court must take into account plaintiff's subjective sensibilities. *Reed,* 95 F.3d at 1179. Kodengada is an immigrant from India and a Hindu. Baschiera's comments concerned his unfavorable attitudes towards immigrants, a religious group and another racial group. On the record before this Court, we cannot say that Kodengada did not reasonably and in good faith believe when he complained to his supervisor and Human Resources, that he was the victim of a hostile work environment.

■ Although plaintiff has satisfied the first three requirement of stating a *prima facie* case, defendant must prevail on summary judgment with respect to the retaliation claim because plaintiff has failed to meet the fourth requirement. Plaintiff has not shown a causal connection between the protected activity and the adverse employment action, which occurred several months after the protected speech. *See Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990). "Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Quinn,* 159 F.3d at 769 (discharge that occurred less than two months after plaintiff filed an internal discrimination complaint and only 10 days after she filed a complaint with New York Division of Human Rights established close temporal relation between protected activity and discharge) (internal quotations omitted); *see also Manoharan,* 842 F.2d at 593; *Stringfellow v. Wyckoff Heights Med. Ctr.,* No. 95 Civ. 3041(ILG), 1998 WL 760286, at *6 (E.D.N.Y. Sep.9, 1998) (plaintiff did not satisfy "causal connection" of his retaliation claim where he was terminated more than four months after he filed a complaint with the EEOC).

Here, the adverse employment action was too removed in time from the protected activity. Plaintiff's complaints about Baschiera's conduct, including the e-mail, took place in or before November of 1996. He was fired in April of 1997—5 months later—by a different supervisor than the one to whom he had complained. In addition, several incidents occurred during that five-month period in which he had problems with co-workers, breaking the chain of causation.

Finally, even if Kodengada is considered to have stated a *prima facie* case of discrimination, he has failed to adduce any admissible evidence rebutting defendant's legitimate, nondiscriminatory reasons for his firing. In other words, he has failed to adduce evidence suggesting that defendant's reasons for his firing were pretextual. *See Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997) ("Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case."); *Van Zant,* 80 F.3d at 714; *Meiri,* 759 F.2d at 997–99 (granting summary judgment for defendant on Title VII claim where employer rebutted plaintiff's prima facie case and plaintiff's only evidence of pretext was "conclusory allegations"); *Scaria v. Rubin,* No. 94 Civ. 3333 AJP SAS, 1996 WL 389250, *5 (S.D.N.Y. July 11, 1996).

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close the case.